EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Oficina de Etica Gubernamental<br><br>Recurrido<br><br>v.<br><br>Gregorio Igartúa de la Rosa<br><br>Peticionario | Certiorari<br><br>2002 TSPR 114<br><br>157 DPR \_\_\_\_ |

Número del Caso: CC-2000-144

Fecha: 4 de septiembre de 2002

Tribunal de Circuito de Apelaciones:
                    Circuito Regional IV

Juez Ponente:
                    Hon.Jorge L. Escribano Medina

Abogado de la Parte Peticionaria:

                    Por Derecho Propio

Abogados de la Parte Recurrida:

                    Lcdo. Luis F. Avilés Colón
                    Lcda. Gretchen  Camacho Rossy
                    Lcda. Zahireh I. Soto Velázquez
                    Lcda. Anaida Garriga Laporte

Materia: Violación al Artículo 3.3 Ley Num. 12 del 24 de julio
de 1985, Según Enmendado

        Este documento constituye un documento oficial del
Tribunal Supremo que está sujeto a los cambios y
correcciones del proceso de compilación y publicación
oficial de las decisiones del Tribunal. Su distribución
electrónica se hace como un servicio público a la
comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

     Recurrido

        v.

Gregorio Igartúa de la Rosa        CC-2000-144    Certi

     Peticionario

SENTENCIA

San Juan, Puerto Rico, a 4 de septiembre de 2002.

Mediante el presente recurso de <u>Certiorari</u>, el peticionario recurre ante nos de una resolución dictada por el Tribunal de Circuito de Apelaciones en un recurso de revisión judicial. La referida resolución confirmó otra emitida por la Oficina de Ética Gubernamental, la cual le impuso al peticionario una multa administrativa por violar el Artículo 3.3(e) de la Ley de Ética Gubernamental.[1] Veamos.

I

El licenciado Gregorio Igartúa de la Rosa es un abogado en la práctica privada de su profesión, con

oficinas en el Municipio de Aguadilla.   En el año 1993

suscribió un contrato de servicios

---

[1] 3 L.P.R.A. sec. 1823(e).

suscribió un contrato de servicios

profesionales para representar y asesorar legalmente al Municipio de Aguadilla, en adelante Municipio, en aquellos asuntos que este último estimara pertinentes. El 8 de junio de 1994 fue nombrado por el entonces Gobernador de Puerto Rico, honorable Pedro Rosselló González, a la Junta de Directores del Banco Gubernamental de Fomento, en adelante Banco, como representante del sector privado;[2] cargo que ocupó hasta el 30 de septiembre de 1999.[3] Durante dicho período de tiempo, no se discutió en el referido cuerpo ninguna propuesta de financiamiento del referido Municipio.[4] De la misma forma, el licenciado Igartúa de la Rosa no participó en ningún otro asunto relacionado con dicho Municipio.[5] Tampoco devengó sueldo alguno por sus funciones como miembro de la Junta de Directores del Banco, solamente le pagaron trescientos dólares ($300) en concepto de dietas por su asistencia a cada reunión de la referida Junta.[6]

Durante el período de tiempo en que el licenciado Igartúa de la Rosa fue miembro de la Junta de Directores del Banco, suscribió con el Municipio los contratos[7] siguientes:

1. 95-008, año fiscal 1994-95, vigente del 1 de julio de 1994 al 30 de junio de 1995.

2. 96-014, año fiscal 1995-96, vigente del 1 de julio de 1995 al 30 de junio de 1996.

3. 97-160, año fiscal 1996-97, vigente del 1 de julio de 1996 al 30 de junio de 1997.

4. 98-9, año fiscal 1997-98, vigente del 1 de julio de 1997 al 30 de junio de 1998.

---

[2] Anejo del recurso de Certiorari, pág. 198.

[3] Íd., pág. 137.

[4] Íd., pág. 72.

[5] Íd.

[6] Íd., pág. 43.

[7] Íd., pág. 144.

Los contratos previamente identificados estaban registrados en la Secretaría del Municipio y en la Oficina del Contralor.[8] Cada uno de los contratos sobrepasaban la suma de tres mil dólares ($3,000). Respondían a los mismos términos y condiciones desde su origen (95-008) y todos los demás después del primero eran renovaciones del mismo. Al comenzar sus funciones como miembro de la Junta de Directores del Banco, el licenciado Igartúa de la Rosa le notificó al entonces Secretario de Hacienda y Presidente de la Junta de Directores del Banco, honorable Manuel Díaz Saldaña, sobre su relación contractual con el Municipio de Aguadilla y le solicitó una dispensa.[9] No surge de la querella ni del expediente ante nos que el licenciado Igartúa de la Rosa se hubiera beneficiado de manera ilegal, por razón de los contratos suscritos, ni que haya cometido delito alguno.

El 28 de mayo de 1998, la Oficina de Ética Gubernamental, en adelante OEG, radicó una querella contra el licenciado Igartúa de la Rosa por violación al Artículo 3.3(e) de la Ley de Ética Gubernamental, supra, alegando que no obtuvo la dispensa correspondiente para sostener relaciones contractuales con el Municipio mientras fungía como miembro de la Junta de Directores del Banco.[10] El 19 de agosto de 1998, el licenciado Igartúa de la Rosa contestó la querella presentada en su contra y negó la violación a la referida disposición estatutaria.[11] El 12 de agosto de 1998, el licenciado Igartúa de la Rosa presentó una Moción de Desestimación ante el referido organismo administrativo, utilizando como fundamento el hecho de que se le había concedido una dispensa retroactiva por la Oficina del Comisionado de Asuntos

---

[8] Íd.

[9] Íd., pág. 60.

[10] Íd., pág. 36.
[11] Íd., pág. 51.

Municipales (OCAM).[12]  La OEG contestó por escrito la referida Moción de Desestimación el 18 de septiembre de 1998.  Alegó que, según la Ley de Ética Gubernamental, supra, el hecho de que se le concediera al licenciado Igartúa de la Rosa una dispensa retroactiva no lo relevaba de su responsabilidad por incumplir con lo dispuesto por ley.[13] Mediante resolución de 23 de noviembre de 1998, la Oficial Examinadora de la OEG dictaminó no ha lugar a la referida moción.[14]

El licenciado Igartúa de la Rosa presentó una "Moción de Solicitud de Resolución Sumaria" el 4 de diciembre de 1998, solicitando que se declarara no ha lugar la querella instada en su contra.[15]  Por su parte, la OEG presentó, el 21 de diciembre de 1998, una "Moción en Solicitud de Resolución Sumaria", alegando que no existía controversia sobre los hechos y que, como cuestión de derecho, procedía la imposición de la multa.[16]  Luego de varios incidentes procesales, que incluyeron la celebración de una vista para discutir las mociones y una estipulación de hechos por las partes, la OEG emitió una resolución imponiéndole al licenciado Igartúa de la Rosa una multa de tres mil dólares ($3,000) por violar el Artículo 3.3(e) de la Ley de Ética Gubernamental, supra.[17]

Inconforme, el licenciado Igartúa de la Rosa recurrió el 15 de diciembre de 1999 ante el Tribunal de Circuito de Apelaciones, mediante recurso de revisión judicial.[18]  El foro apelativo intermedio emitió resolución denegando el auto de revisión solicitado el 30 de noviembre

---

[12] Íd., pág. 53.

[13] Íd., pág. 63.

[14] Íd., pág. 71.

[15] Íd., pág. 73.

[16] Íd., pág. 79.

[17] Íd, pág. 138.

[18] Íd., pág. 1.

de 1999, copia de cuya notificación se archivó en autos el 15 de diciembre del mismo año.[19] Ese Tribunal determinó que el licenciado Igartúa de la Rosa es un funcionario público a quien le aplica la Ley de Ética Gubernamental, supra, y que, en efecto, violó su Artículo 3.3(e).

El 22 de febrero de 2000, el licenciado Igartúa de la Rosa recurrió ante esta Curia, mediante el presente recurso de Certiorari, imputándole al Tribunal de Circuito de Apelaciones la comisión de los errores siguientes:

> PRIMERO: ERRO EL DIRECTOR DE LA OEG AL APLICAR ARBITRARIAMENTE LA LEY DE ETICA A UN DIRECTOR DEL SECTOR PRIVADO DE LA JUNTA DEL BANCO GUBERNAMENTAL DE FOMENTO IGNORANDO QUE A ESTE LE APLICA LA LEY ESPECIAL QUE CREA EL BANCO Y EN VIOLACIÓN A SU DERECHO AL DEBIDO PROCESO DE LEY Y A LA IGUAL PROTECCIÓN DE LAS LEYES Y EL TRIBUNAL APELATIVO AL DENEGAR LA SOLICITUD DE RECURSO DE REVISIÓN PRESENTADO POR EL RECURRENTE A ESTOS MISMOS EFECTOS.

> SEGUNDO: ERRO EL DIRECTOR DE OEG AL DETERMINAR QUE UN DIRECTOR DEL SECTOR PRIVADO DE LA JUNTA DE DIRECTORES DEL BANCO GUBERNAMENTAL ES FUNCIONARIO PUBLICO SEGÚN LA LEY DE ETICA PARA IMPONERLE UNA MULTA, VIOLANDO ASI SU DERECHO AL DEBIDO PROCESO DE LEY Y A LA IGUAL PROTECCIÓN DE LAS LEYES Y EL TRIBUNAL APELATIVO AL DENEGAR LA SOLICITUD DE RECURSO DE REVISIÓN PRESENTADO POR EL RECURRENTE A ESTOS MISMOS EFECTOS.

> TERCERO: ERRO EL DIRECTOR DE OEG AL DETERMINAR QUE EL RECURRENTE REQUERIA DISPENSAS (UN REQUERIMIENTO ARBIBRARIO) POR CONTRATOS DE SERVICIOS LEGALES CON EL MUNICIPIO DE AGUADILLA PARA IMPONERLE UNA MULTA, Y POR CONSIGUIENTE VIOLARLE SU DERECHO AL DEBIDO PROCESO DE LEY Y A LA IGUAL PROTECCIÓN DE LAS LEYES Y EL TRIBUNAL APELATIVO AL DENEGAR LA SOLICITUD DE RECURSO DE REVISIÓN PRESENTADO POR EL RECURRENTE A ESTOS MISMOS EFECTOS.

> CUARTO: ERRO EL DIRECTOR DE OEG AL RADICAR UNA QUERELLA E IMPONERLE UNA PENALIDAD AL RECURRENTE EN VIOLACIÓN DE SUS DERECHOS AL DEBIDO PROCESO DE LEY Y A LA IGUAL PROTECCIÓN DE LAS LEYES Y EL TRIBUNAL APELATIVO AL DENEGAR LA SOLICITUD DE RECURSO DE REVISIÓN PRESENTADO POR EL RECURRENTE A ESTOS MISMOS EFECTOS.

---

[19] Íd., pág. 169.

QUINTO: ERRO EL DIRECTOR DE OEG AL DEMOSTRAR PREJUICIO Y PARCIALIDAD POR HACER UN COMUNICADO DE PRENSA DE LA MULTA IMPUESTA AL PETICIONARIO SIN HABERSE AGOTADO EL RECURSO ADMINISTRATIVO DE RECONSIDERACIÓN AÚN DISPONIBLE Y POR LO CUAL VIOLÓ SUS DERECHOS AL DEBIDO PROCESO DE LEY Y A LA IGUAL PROTECCIÓN DE LAS LEYES Y EL TRIBUNAL APELATIVO AL DENEGAR LA SOLICITUD DE RECURSO DE REVISIÓN PRESENTADO POR EL RECURRENTE A ESTOS MISMOS EFECTOS.

SEXTO: ERRO EL DIRECTOR DE OEG AL NO CONTINUAR MEDIANTE UNA VISTA CON LOS PROCEDIMIENTOS DE LA QUERELLA AL DENEGAR LA DESESTIMACIÓN SUMARIA Y POR CONSIGUIENTE VIOLÓ SU DERECHO AL DEBIDO PROCESO DE LEY Y A LA IGUAL PROTECCIÓN DE LAS LEYES Y EL TRIBUNAL APELATIVO AL DENEGAR LA SOLICITUD DE RECURSO DE REVISIÓN PRESENTADO POR EL RECURRENTE A ESTOS MISMOS EFECTOS.

Con el beneficio de la comparecencia de ambas partes, resolvemos.

II

Por estar igualmente dividido el Tribunal y habiéndose expedido previamente el auto solicitado, se dicta sentencia confirmando la resolución emitida por el Tribunal de Circuito de Apelaciones.[20]
Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Naveira de Rodón disiente con opinión escrita. El Juez Asociado señor Hernández Denton emitió Opinión de Conformidad, a la cual se une el Juez Presidente señor Andréu García. El Juez Asociado señor Rivera Pérez disiente con opinión escrita, a la cual se une el Juez Asociado señor Rebollo López. El Juez Asociado señor Corrada del Río está inhibido.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

---

[20] Para poder revocar una sentencia dictada por el Tribunal de Circuito de Apelaciones, se requiere la concurrencia de una mayoría de los Jueces de este Tribunal que intervengan en la consideración del recurso. Regla 4(a) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A, R. 4(a) y Junta Insular de Elecciones v. Corte, 63 D.P.R. 819 (1944).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

    Recurrido

        v.

                          CC-2000-144

Gregorio Igartúa de la Rosa

    Peticionario

**Opinión Disidente emitida por la Juez Asociada señora NAVEIRA DE RODÓN**

San Juan, Puerto Rico a 4 de septiembre de 2002

Emitimos este voto disidente para hacer constar los fundamentos por los cuales entendemos que en las circunstancias de este caso, no procede que se le impute al Lcdo. Gregorio Igartúa de la Rosa (en adelante Lcdo. Igartúa o peticionario) una violación al Art. 3.3(e) de la Ley de Ética Gubernamental, Ley Núm. 12 de 24 de julio de 1985, según enmendada, 3 L.P.R.A. § 1801 *et seq* (en adelante Ley de Ética Gubernamental).

I

**El Lcdo. Igartúa comenzó a rendir servicios profesionales como abogado para el Municipio de**

**Aguadilla en el año 1993. Desde el 8 de julio de 1994 hasta el 30 de septiembre de 1999, se desempeñó como miembro de la Junta de Directores del Banco Gubernamental de Fomento (en adelante BGF), representando al sector privado. Por sus funciones como miembro de la referida Junta el Lcdo. Igartúa sólo recibía como compensación trescientos dólares ($300) en concepto de dietas por asistir a reuniones.**

Mientras ocupaba el cargo en el BGF, el Lcdo. Igartúa continuó renovando su contrato de servicios profesionales con el Municipio de Aguadilla. Así pues, después de haber sido nombrado a la Junta de Directores del BGF, el peticionario rindió servicios legales al Municipio desde el 1 de julio de 1994 al 30 de julio de 1998, mediante contratos de servicios profesionales que fueron prorrogando anualmente durante ese periodo. Todos los contratos sobrepasaban la cantidad de tres mil dólares ($3,000).

Dos semanas después de haber comenzado sus funciones en el BGF, el Lcdo. Igartúa le envió carta de 30 de agosto de 1994 al entonces Secretario de Hacienda y también Presidente de la Junta de Directores del BGF, Manuel Díaz Saldaña, **en la cual le solicitó una dispensa en relación al contrato de servicios profesionales que tenía con el Municipio de Aguadilla**. En dicha misiva, el Lcdo. Igartúa también indicó que mientras se resolvía el asunto de la dispensa **"me abstendré en la Junta de cualquier asunto relacionado con el Municipio de Aguadilla."**[21]

El Lcdo. Igartúa nunca obtuvo respuesta del Secretario de Hacienda con relación a su solicitud de dispensa. Así las cosas, el 28 de mayo

---

[21] Como cuestión de realidad, el peticionario nunca participó durante el periodo de 1 de julio de 1994 a 31 de octubre de 1998 en ningún asunto relacionado con financiamientos por parte del BGF al

de 1998 la Oficina de Ética Gubernamental (en adelante OEG) radicó una querella contra el Lcdo. Igartúa por violación al Art. 3.3(e) de la Ley de Ética Gubernamental, 3 L.P.R.A. § 1823(e).  La OEG le imputó al peticionario el no haber obtenido la dispensa correspondiente para contratar con el Municipio de Aguadilla mientras era funcionario del BGF, según lo exige el Art. 3.3(e) de la Ley de Ética Gubernamental. El Lcdo. Igartúa contestó la querella y señaló que la Oficina del Comisionado de Asuntos Municipales (en adelante OCAM) le había concedido una dispensa retroactiva para los años en los cuales había otorgado contratos de servicios profesionales con el Municipio de Aguadilla.

Luego de varios trámites procesales, la OEG le impuso al peticionario una multa de tres mil dólares ($3,000) por haber violado el Art. 3.3(e) de la Ley de Ética Gubernamental.  Inconforme, éste recurrió al Tribunal de Circuito de Apelaciones, el cual denegó el recurso solicitado.  Señaló el foro apelativo que el Lcdo. Igartúa era un funcionario público por lo cual le aplicaba el Art. 3.3(e), y que efectivamente había violado dicha disposición.

Aún inconforme, el Lcdo. Igartúa recurrió ante nos mediante recurso de certiorari.  Alegó esencialmente que sus funciones en el BGF no lo catalogaban como un funcionario público, y por tanto la Ley de Ética Gubernamental no le era de aplicación, y que el Art. 3.3(e) era inconstitucional.

Ciertamente, no cabe duda de que las funciones del Lcdo. Igartúa en el BGF y la naturaleza de su cargo en dicha entidad lo cualifican como un funcionario público, y como tal, está sujeto a las disposiciones de la Ley de Ética Gubernamental.  Sin embargo, por las razones que

---

Municipio de Aguadilla.  Así surge de una certificación a esos efectos emitida por el BGF el 1 de diciembre de 1998.

expondremos, consideramos que en este caso no procede la imposición de sanciones al Lcdo. Igartúa.   Veamos.

II

**El Art. 3.3(e) de la Ley de Ética Gubernamental dispone, en lo pertinente, lo siguiente:**

> Ningún funcionario o empleado público podrá tener algún interés en las ganancias o beneficios producto de un contrato con cualquier otra agencia ejecutiva o dependencia gubernamental a menos que el Gobernador, previa recomendación del Secretario de Hacienda y del Secretario de Justicia, expresamente lo autorice.

En términos muy sencillos, esta disposición requiere que un funcionario público solicite y obtenga una dispensa del Gobernador, según lo recomienden los Secretarios de Hacienda y Justicia, para que pueda contratar simultáneamente con otra agencia o dependencia gubernamental.  A manera de excepción, dicha dispensa no es necesaria cuando se trata de contratos por menos de tres mil dólares ($3,000), de financiamiento de viviendas asegurado por una agencia gubernamental o programas de incentivos, o cuando se trata de préstamos y garantías que auspician las distintas agencias gubernamentales.

Aunque la facultad última para conceder dispensas bajo esta sección le fue concedida al Gobernador, éste ha delegado dicha facultad a diversos funcionarios o jefes de agencia.  En los casos en que la agencia contratante sea un Municipio, la facultad para conceder dispensas bajo el Art. 3.3(e) le fue otorgada a la OCAM mediante Orden Ejecutiva OE-1991-86 de 17 de diciembre de 1991.

Como señaláramos anteriormente, el Lcdo. Igartúa, como miembro de la Junta de Directores del BGF, era un funcionario público.  Por consiguiente, de acuerdo con el Art. 3.3(e) de la Ley de Ética

Gubernamental y la OE-1991-86, éste debía solicitar una dispensa para contratar sus servicios profesionales con el Municipio de Aguadilla y a su vez continuar ejerciendo sus funciones en el BGF, la cual OCAM tenía facultad de otorgar o denegar.

No hay controversia en cuanto al hecho de que el Lcdo. Igartúa no obtuvo una dispensa de la OCAM para continuar su relación profesional con el Municipio de Aguadilla luego de su nombramiento en el BGF, hasta luego de sometida la querella por la OEG.  No obstante, los hechos de este caso demuestran que el Lcdo. Igartúa no fue indiferente ante lo requerido por la Ley de Ética Gubernamental.  Como cuestión de realidad, **el peticionario sí solicitó una dispensa para continuar contratando con el Municipio de Aguadilla apenas dos (2) semanas después de haber comenzado sus funciones en el BGF**.  Lo que sucede es que la solicitud no fue hecha a la OCAM, sino a través del Secretario de Hacienda, funcionario que, según el propio Art. 3.3(e) de la Ley de Ética tiene la facultad y el deber de hacerle recomendaciones al Gobernador relacionadas a la concesión de dispensas.

De otra parte, el Art. 3.3(e) de la mencionada Ley dispone que un funcionario público que desee contratar con una entidad gubernamental tiene que solicitar una dispensa antes de otorgar el referido contrato.  Según la prueba que obra en el expediente, la relación profesional del peticionario con el Municipio comenzó mediante un contrato prorrogable de año en año el **1 de julio de 1993**, es decir, **antes** de éste ser nombrado en la Junta de Directores del BGF, cosa que ocurrió el **8 de junio de 1994**.  Es desde esta fecha que el peticionario advino un funcionario público sujeto a los requisitos del Art. 3.3(e).

Como se puede apreciar, a la fecha en que el Lcdo. Igartúa fue nombrado al BGF, ya estaba vigente el contrato entre éste y el Municipio

de Aguadilla. Más aún, a esa fecha dicho contrato había quedado prorrogado por un año adicional, según lo disponía la cláusula número cuatro del mismo.[22] En estas circunstancias era sencillamente imposible para el peticionario solicitar la dispensa antes de contratar con el Municipio, pues ya dicho contrato estaba vigente cuando comenzó sus funciones en el BGF. Resulta pues ilógico que se le penalice por esta razón.

Nótese además que en el momento en que el Lcdo. Igartúa solicitó la dispensa al Secretario de Hacienda, Manuel Díaz Saldaña, éste era además el Presidente de la Junta de Directores del BGF. Lógicamente, el Lcdo. Igartúa le solicitó dispensa a este funcionario ya que el Secretario no sólo era el Presidente de la Junta de Directores de la cual el peticionario formaba parte, sino que además tenía el deber, según lo dispuesto en el propio Art. 3.3(e), de hacer la recomendación que entendiese pertinente sobre si debía o no otorgarse la misma.

**El proceder del Lcdo. Igartúa hay que analizarlo a la luz de lo resuelto recientemente por este Tribunal en <u>O.E.G.</u> V. <u>Cordero, Rivera</u>, res. el 21 de agosto de 1991, 154 D.P.R. \_\_\_\_ (2001), 2001 T.S.P.R. 118, 2001 JTS 119. Allí expresamos que** "el propósito primordial de la Ley de Ética Gubernamental, según enmendada, y su Reglamento, es combatir y prevenir la corrupción en todas las ramas de gobierno, prohibir que los funcionarios hagan uso de ventajas indebidas en la consecución de sus intereses personales, y que utilicen su posición de liderato y poder para obtener beneficios

---

[22] Específicamente, esta cláusula dispone que "el periodo de duración de este contrato será de doce (12) meses, comenzando el primero de julio de mil novecientos noventa y tres (1993) hasta el treinta (30) de junio de mil novecientos noventa y cuatro (1994). Entendiéndose que **el mismo será prorrogable a partir de esta fecha, de año en año, a menos que cualquiera de las dos partes notifique a la otra con sesenta (60) días de antelación a la fecha de expiración de cualesquiera de**

económicos indebidos." **Además, señalamos específicamente nuestra preocupación de que en nuestro afán de combatir la corrupción desvirtuásemos los propósitos de la Ley de Ética Gubernamental, "convirtiéndola en un instrumento para cometer injusticias, dañar permanentemente la reputación de funcionarios públicos que han servido al país con dignidad, honradez y dedicación, y desalentar el que las personas más capacitadas escojan dedicarse al servicio público."**

**Consideramos que la aplicación automática de las disposiciones de la Ley de Ética Gubernamental al caso de autos, sin tomar en consideración el contexto en que se da la conducta alegadamente no ética del Lcdo. Igartúa, conlleva precisamente la injusticia que advertimos en <u>O.E.G.</u> V. <u>Cordero, Rivera</u>, <u>supra</u>. Evaluadas las gestiones del peticionario en cuanto a su solicitud de dispensa y la forma en que se condujo durante sus funciones en el BGF y como abogado del Municipio de Aguadilla, no encontramos ni tan siquiera un asomo de corrupción gubernamental. La conducta del peticionario podría ser catalogada quizás como de dejadez, la cual ni siquiera es atribuible enteramente a su persona ya que, si bien es cierto que no le dio seguimiento a su solicitud de dispensa, también es cierto que el Secretario de Hacienda, funcionario facultado por la propia ley para intervenir en dicho procedimiento <u>tampoco hizo nada al respecto</u>, ni siquiera cuando advino a ser el Contralor de Puerto Rico en el año 1997. Por el contrario, y con pleno conocimiento de la situación particular del Lcdo. Igartúa, el Secretario de Hacienda y luego Contralor le permitió a éste continuar en sus gestiones sin**

---

**<u>los años en que esté vigente dicho contrato, que desea terminar con el mismo</u>."**

hacerle advertencia u observación alguna sobre la posibilidad de conflicto con la Ley de Ética Gubernamental.

En estas circunstancias, es razonable concluir que el Lcdo. Igartúa actuó durante esos años bajo la genuina creencia de que estaba ejerciendo sus funciones con toda legalidad.  Dicha creencia debió estar más reforzada aún para el peticionario por el hecho de que en el ejercicio de sus funciones nunca incurrió en conflicto de interés alguno entre sus servicios profesionales al Municipio de Aguadilla y sus gestiones como miembro de la Junta de Directores del BGF.

No fue sino hasta el año 1998, cuando la OEG le radica una querella, que el Lcdo. Igartúa adviene en conocimiento cabal de su situación.  Inmediatamente hizo las gestiones necesarias para lograr que los funcionarios gubernamentales perfeccionaran los trámites para que él pudiese obtener dispensa.  No creemos que la celeridad con que el peticionario cumplió con ese trámite una vez radicada la querella en su contra se debiera a que tenía conocimiento de antemano de dicho trámite y no se había tomado la molestia de hacer algo al respecto.  Más bien, la actuación del Lcdo. Igartúa demuestra su candidez al esforzarse por cumplir rápidamente con un trámite que, con toda probabilidad, desconocía y del cual fue informado en la propia querella en su contra.  Es importante que destaquemos el hecho de que, al 30 de agosto de 1994, cuando el peticionario le solicitó la dispensa al Secretario de Hacienda, la OE-1991-86 llevaba apenas ocho (8) meses de aprobada.  Es muy probable que el Lcdo. Igartúa no conociera en ese momento que la decisión final sobre la concesión de la dispensa correspondía a la OCAM.[23]

---

[23]    Resulta interesante señalar aquí que la propia OCAM, al concederle la dispensa retroactiva al Lcdo. Igartúa, señaló que "la presente petición se considera, a pesar de ser retroactiva, tomando en consideración que se ha demostrado que al momento en que se otorgaron

Tomando en consideración las circunstancias muy particulares de este caso, entendemos que no se justifica una aplicación automática de la Ley de Ética Gubernamental.  Precisamente, el caso de autos evidencia las injusticias que se pueden cometer cuando se recurre al automatismo en la aplicación e interpretación de la ley, sobretodo en un estatuto de carácter moral y ético.

Al aplicar la Ley de Ética Gubernamental, debemos evitar que ésta se convierta en un arma de ataque contra cualquier funcionario público que alegadamente haya incumplido con alguna de sus disposiciones, sin antes analizar las circunstancias específicas en que se da la alegada violación.  Esta ley debe ser un instrumento para combatir la corrupción, no para castigar a funcionarios sin importar que éstos demuestren que en su caso no hubo conflicto de intereses, venta de influencias, ni beneficios económicos indebidos. Debemos tener presente el principio de que al interpretar una disposición específica de una ley, es nuestra obligación fundamental imprimirle efectividad a la intención legislativa, propiciando de esta forma la realización del propósito que persigue la Ley, siempre, claro está, teniendo presente el fin social que la inspiró.  Véase: O.E.G. v. Cordero, Rivera, supra; Vázquez v. A.R.P.E., 128 D.P.R. 513, 523 (1991); Zambrana v. E.L.A., 129 D.P.R. 740 (1992); Gobernador de P.R. v. Alcalde de Coamo, 131 D.P.R. 614 (1992).

III

---

los contratos notificó a las agencias concernidas con relación a los mismos y no le orientaron sobre el procedimiento y los requisitos de ley que debió seguir; además, la pronta diligencia realizada para obtener la dispensa una vez tuvo conocimiento de la querella presentada por la Oficina de Ética Gubernamental... lo que demuestra el no haber tenido intención de violar la ley."

En resumen, considerada la prueba que obra en el expediente, es nuestro criterio que no procede imponer sanciones al Lcdo. Igartúa por violación al Art. 3.3(e) de la Ley de Ética Gubernamental. Consta claramente que el peticionario solicitó la dispensa al comienzo de sus labores con el BGF, y se la solicitó al Secretario de Hacienda, funcionario que según el propio Art. 3.3(e) está directamente relacionado con dicho procedimiento. El hecho de que luego el Lcdo. Igartúa no haya continuado la gestión no necesariamente denota desinterés de su parte, sino más bien, confianza en que, si el propio Secretario de Hacienda, quien también era Presidente de la Junta de Directores del BGF no le manifestó objeción, no había ilegalidad alguna en el hecho de que continuara ofreciendo sus servicios profesionales al Municipio de Aguadilla.

Además, debemos tener muy en cuenta que surge específicamente del expediente que los contratos suscritos entre el Lcdo. Igartúa y el Municipio de Aguadilla fueron radicados en la Secretaría del Municipio y Oficina del Contralor, de acuerdo con el Reglamento Núm. 33 de la Oficina del Contralor, Reglamento Núm. 5743 de 28 de enero de 1998. Durante el periodo en controversia la Oficina del Contralor, que tiene una obligación legal de pasar juicio y rendir informes sobre "las cuentas, los desembolsos y los ingresos de las agencias, instrumentalidades y subdivisiones políticas en relación con los cuales se descubran irregularidades",[24] y que como cuestión de hecho tenía ante sí los contratos otorgados por el Lcdo. Igartúa, nunca le informó al peticionario de problema o ilegalidad alguna respecto a los mismos. Cabe también señalar que desde el 1997, antes de presentarse la querella que nos ocupa, el Contralor lo era Manuel

---

[24]    Véase el Art. 12 de la Ley Núm. 9 de 24 de julio de 1952, ley que creó la Oficina del Contralor de Puerto Rico, 2 L.P.R.A. § 82.

Díaz Saldaña, la misma persona a quien, siendo entonces Secretario de Hacienda y Presidente del BGF, el Lcdo. Igartúa le solicitó la dispensa.

Finalmente, los autos demuestran que mientras estuvo ejerciendo sus funciones como abogado del Municipio de Aguadilla y miembro de la Junta del BGF, el Lcdo. Igartúa no participó en transacción alguna que constituyera un conflicto de intereses, como tampoco obtuvo ventajas indebidas para el Municipio aprovechándose de su posición en el BGF.

Por todo lo antes expuesto, revocaríamos el dictamen del Tribunal de Circuito de Apelaciones, así como la multa impuesta por la Oficina de Ética Gubernamental al Lcdo. Igartúa.  Disentimos pues, de la sentencia dictada por este Tribunal.


                                        Miriam Naveira de Rodón
                                            Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

  Demandante y Recurrido

  v.                                CC-2000-144    Certiorari

Gregorio Igartúa De La Rosa

  Demandado y Peticionario

**Opinión de Conformidad emitida por el Juez Asociado señor Hernández Denton a la cual se une el Juez Presidente señor Andréu García**

**San Juan, Puerto Rico a 4 de septiembre de 2002.**

**Toda vez que la sentencia dictada por este tribunal confirma el dictamen del Tribunal del Circuito de Apelaciones en el presente caso, por virtud de la Regla 4(a) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A R.4, estamos conforme con la misma. Sin embargo, debemos expresarnos en el presente caso por la importancia que merece la transparencia en las actuaciones gubernamentales.**

**En la presente controversia nos corresponde examinar la sanción administrativa que la Oficina de Ética Gubernamental impuso a Gregorio Igartúa De La Rosa por infringir el Artículo 3.3(e) que prohíbe que un funcionario público sea parte o**

tenga algún interés en las ganancias o beneficios producto de un contrato con cualquier otra agencia ejecutiva o dependencia gubernamental. Por entender que la determinación de la Oficina de Ética Gubernamental fue una razonable y dentro del marco de su conocimiento especializado que merece nuestra deferencia, procede confirmar la sentencia recurrida.

I

Igartúa De La Rosa fue nombrado por el Gobernador de Puerto Rico como miembro de la Junta de Directores del Banco Gubernamental de Fomento en el 1994. Mientras era miembro de dicha Junta, otorgó cuatro (4) contratos de servicios profesionales con el Municipio de Aguadilla sin la dispensa requerida por el artículo 3.3(e) de la Ley de Ética Gubernamental.[25] En términos generales este artículo prohíbe la contratación de un funcionario público con alguna agencia o dependencia gubernamental, y contempla la concesión de una dispensa en situaciones excepcionales.

En virtud de la otorgación de dichos contratos, el 28 de mayo de 1998 la Oficina de Ética Gubernamental presentó querella contra Igartúa De La Rosa por violación al referido artículo. Una vez la Oficina de Ética presentó querella, Igartúa De La Rosa solicitó inmediatamente una dispensa retroactiva a la Oficina del Comisionado de Asuntos Municipales para que se le autorizaran los contratos. Luego de obtenida dicha dispensa el 11 de agosto de 1998, Igartúa De La Rosa solicitó a la Oficina de Ética Gubernamental que desestimara la querella, toda vez que había obtenido la dispensa que

---

[25] Según lo estipularon las partes, los contratos eran los siguientes: 1) 95-008 año fiscal 94-95 del 1 de jul. 94 al 30 de jun. 95, 2) 96-014 año fiscal 95-96 del 1 jul. 95 al 30 de jun. 96, 3) 97-160 año fiscal 96-97 del 1 jul. al 30 de jun. 97, 4) 98-009 año fiscal 97-98 del 1 de jul. al 30 de jul. 98. Todos estos contratos excedían la cantidad de $3,000 por año fiscal.

contempla el referido artículo 3.3(e). El Director Ejecutivo de la Oficina de Ética Gubernamental le impuso una multa de $3,000 y precisó que, a tenor con la Ley de Ética Gubernamental, la referida dispensa retroactiva que consiguió Igartúa De La Rosa sería sólo una atenuante mas no un eximente de la conducta sancionada.

Igartúa De La Rosa acudió al Tribunal de Circuito de Apelaciones solicitando que dejara sin efecto la resolución de la Oficina de Ética Gubernamental. Sin embargo, el foro apelativo determinó que Igartúa De La Rosa "carecía de argumento de hecho y de derecho que lo eximiera de responsabilidad conforme a la Ley de Ética Gubernamental", por lo que denegó su recurso. Inconforme acude ante nos, alegando en esencia que no procedía imponerle una multa, porque la redacción del artículo 3.3(e) es ambigua, adolece de vaguedad y su aplicación puede ser contradictoria, arbitraria o discriminatoria, por lo cual debía invalidarse.

Luego de expedir el auto solicitado y con el beneficio de las comparecencias de las partes, estamos en posición de resolver.

II

La responsabilidad ética y la integridad moral son principios rectores que la sociedad puertorriqueña les exige y reclama a los funcionarios y a las instituciones del gobierno de Puerto Rico. Exposición de Motivos de la Ley de Ética Gubernamental, Ley Núm. 12 del 24 de julio de 1985, 3 L.P.R.A. sec. 1801 *et sec*. El estado de derecho que establece este estatuto, va dirigido a velar que la gerencia gubernamental incorpore y consagre las más altas normas de sana administración pública e incluye un Código de Ética que reglamenta la conducta de los funcionarios y empleados públicos. Id. El principio cardinal de esta legislación es proscribir acciones que ponen en riesgo la estabilidad del soporte moral del Estado. Id.

El artículo 3.3(e) es un ejemplo específico de cómo se instrumenta los principios de la Ley de Ética Gubernamental antes declarados. Este artículo prohíbe el que algún funcionario o empleado público pueda ser parte o tener algún interés en las ganancias o beneficios producto de un contrato con cualquier otra agencia ejecutiva o dependencia gubernamental. Examinemos el texto del referido artículo:

> Ningún funcionario o empleado público podrá ser parte o tener algún interés en las ganancias o beneficios producto de un contrato con cualquier otra agencia ejecutiva o dependencia gubernamental a menos que el Gobernador, previa recomendación del Secretario de Hacienda y del Secretario de Justicia, expresamente lo autorice. Sólo podrá llevarse a cabo la contratación en el caso previsto en este inciso sin solicitar y obtener la autorización del Gobernador cuando se trate de:
> (1) Contratos por un valor de $3,000.00 ó menos y ocurran una sola vez durante cualquier año fiscal.
> (2) Contratos de arrendamiento, permuta, compraventa, préstamo, seguro hipotecario o de cualquier otra naturaleza que se refieran a una vivienda y/o solar provisto o a ser financiado o cuyo financiamiento es asegurado o garantizado por una agencia gubernamental.
> (3) Programas de servicios, préstamos, garantías e incentivos auspiciados por agencias gubernamentales. 3 L.P.R.A. 1823.(Énfasis suplido)

Así, el artículo 3.3(e) dispone que no se podrá efectuar dicho contrato a menos que el Gobernador, previa recomendación del Secretario de Hacienda y del Secretario de Justicia, expresamente lo autorice. Con respecto a los contratos con municipios, el Gobernador por Orden Ejecutiva delegó en el 1991 al Comisionado de Asuntos Municipales la facultad de otorgar las dispensas para formalizar contratos entre los municipios y los empleados públicos. De esta manera se aseguraría mayor agilidad administrativa y se delegarían estas funciones a los funcionarios que regularmente

intervienen en estos asuntos y poseen un mayor conocimiento de los factores a considerarse. Boletín Administrativo OE-1991-86.[26]

Dicha dispensa se concibe como una excepción a la conducta sancionada, tal como se desprende del historial legislativo de la referida ley.[27] El mismo explica que el Gobernador podrá conceder dispensas cuando entienda que es necesario para el beneficio del interés público. Es decir, se aplica sólo a situaciones excepcionales.

Por su parte, el artículo 3.3(h) de la Ley de Ética Gubernamental expresamente aclara, que cuando un funcionario obtenga una dispensa luego de que el Director de la Oficina de Ética Gubernamental le hiciera señalamientos de violaciones, la misma será considerada como atenuante mas no como eximente de responsabilidad. Dispone concretamente el artículo 3.3(h):

> En todo caso en que se haya concertado un contrato en violación a lo dispuesto en esta sección, y que señalada la violación por el Director de la Oficina de Ética Gubernamental no se han realizado gestiones para obtener la dispensa dentro de los diez (10) días siguientes al señalamiento, el contrato será anulable y se autoriza a la Oficina de Ética Gubernamental y al Secretario de Justicia a solicitar a los tribunales de justicia, en representación del Estado Libre Asociado, que tal contrato sea declarado nulo. Cuando se otorgue un contrato sin obtener la dispensa

---

[26] En la dispensa otorgada en el presente caso por la Oficina del Comisionado de Asuntos Municipales, el Comisionado concedió la dispensa no sin antes hacer las siguientes indicaciones:

> El Secretario de Justicia en reiteradas ocasiones ha emitido opinión, y nuestra Oficina la ha adoptado, de no favorecer las dispensas retroactivas, a no ser que se demuestre que existen circunstancias especiales que ameriten el que se haga la excepción a la norma. La presente petición se considera, a pesar de ser retroactiva, tomando en consideración que ha demostrado que al momento en que se otorgaron los contratos notificó a algunas de las agencias concernidas con relación a los mismos y no le orientaron sobre el procedimiento y los requisitos de ley que debió seguir ... (citando Opinión del Secretario de Justicia del 26 de junio de 1986 y del 8 de julio de 1987).

[27] Véase, Informe del Senado sobre el P. del S. 50.

**a la que se refieren los incisos (d) y (e), o cuando la misma sea obtenida luego de otorgado el contrato, el Director de la Oficina de Ética Gubernamental podrá imponer una multa a los funcionarios responsables por la omisión de obtener a dispensa, conforme a lo dispuesto en la sec. 2201 de este título.** Las gestiones para obtener la dispensa dentro de los diez (10) días siguientes al señalamiento del Director de una violación a los incisos (d) y (e) serán consideradas como atenuantes pero no eximirán de responsabilidad a los funcionarios objeto del señalamiento. **(Énfasis suplido).**

**De otra parte hemos resuelto reiteradamente que las determinaciones de organismos administrativos especializados merecen gran consideración y respeto. <u>San Antonio Maritime v. Puerto Rican Cement</u>, res. el 16 de febrero de 2001, 2001 TSPR 16. <u>Asociacion Vecinos del Hospital San Jorge v. United Medical</u> res. el 19 de enero de 2000, 2000 TSPR 7, <u>Municipio de San Juan v. Junta de Calidad Ambiental</u>, res. el 14 de diciembre de 2000, 2000 TSPR 183, <u>Rivera v. A & C Development</u> 144 D.P.R. 450 (1997). La Ley de Procedimiento Administrativo Uniforme en su sección 4.5 establece límites al alcance de la revisión judicial de decisiones administrativas y dispone que las determinaciones de hecho de las agencias serán sostenidas por el Tribunal si se basan en evidencia sustancial que obre en el expediente administrativo. 3 L.P.R.A. sec. 2175.  Por lo tanto, estamos obligados a sostener tales determinaciones si están respaldadas por evidencia suficiente que surja del expediente administrativo considerado en su totalidad.  <u>Misión Industrial</u>, supra. Hemos definido evidencia sustancial como "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión."  <u>Misión Industrial</u>, supra; <u>Hilton Hotels v. Junta de Salario Mínimo</u>, 74 D.P.R. 679, 687 (1953).**

Como regla general los tribunales le reconocen gran peso y deferencia a las interpretaciones hechas por la agencia administrativa de las leyes que tiene a su haber poner en vigor. <u>T-JAC v. Caguas</u>

Centrum Limited, res. el 12 de abril de 1999, 99 TSPR 54. La revisión judicial de las determinaciones administrativas está limitada a examinar si la actuación administrativa fue razonable y cónsona con el propósito legislativo o si por el contrario fue irrazonable, ilegal o si medió abuso de discreción. T-JAC v. Caguas Centrum Limited, supra; Rivera Rentas v. A & C Development Corp., supra.

Así también, en los casos en que una agencia impone sanciones por la violación de las leyes y reglamentos que dicha agencia administra se le reconoce mucha discreción para seleccionar las sanciones que le ayuden a cumplir con los objetivos estatutarios, siempre que haya obrado dentro del marco de su conocimiento especializado y de la ley. Estado Libre Asociado de Puerto Rico v. Frigorífico, res. el 28 de agosto de 2001, 2001 TSPR 120. Si la decisión administrativa está basada en evidencia sustancial, no es ultra vires y tiene además relación razonable con los actos que se quieren prohibir, los tribunales brindarán considerable deferencia a la sanción impuesta por la agencia. Rivera Rentas, supra.

**A la luz de la normativa anterior, pasemos a considerar la controversia que nos ocupa.**

III

A

A nuestro entender el caso de marras es de fácil solución. Igartúa De La Rosa otorgó cuatro (4) contratos con el Municipio de Aguadilla, mientras que a su vez formaba parte de la Junta de Gobierno del Banco de Fomento. Esta precisamente es la conducta que proscribe el artículo 3.3(e) y en la cual incurrió Igartúa De La Rosa. Entiéndase por tal conducta aquella en que un funcionario que es parte o tiene algún interés en las ganancias o beneficios producto de un contrato con cualquier otra agencia ejecutiva o dependencia gubernamental.

Igartúa De La Rosa obtuvo una dispensa retroactiva luego de radicada en su contra la querella. Correctamente, el Director de la Oficina de Ética Gubernamental, una vez finalizado el procedimiento administrativo, multó al querellado por la cantidad de $3,000 y determinó que la dispensa que obtuvo Igartúa De La Rosa sirvió de atenuante y no de eximente, tal como lo indica la ley. Dicha actuación administrativa, al igual que la sanción impuesta, fue razonable y cónsona con el propósito legislativo del artículo 3.3(e) por lo que merece respeto y deferencia. La Oficina de Ética Gubernamental en todo momento se basó en evidencia sustancial que obró en el expediente y actuó dentro del marco de su conocimiento especializado. Ciertamente, su determinación guardó relación razonable con los actos que desea prohibir, por lo que nuestra revisión debe otorgarle deferencia y consideración a la sanción impuesta.

B

Pese a lo anterior, el peticionario propone que invalidemos el Artículo 3.3(e) porque según alega no hay normas claras en la manera de obtener una dispensa, por lo que dicho estatuto es muy vago y se presta a la arbitrariedad. Simple y llanamente no podemos avalar dicha propuesta.

El peticionario nos solicita que invalidemos un estatuto de cardinal importancia para la transparencia de las actuaciones gubernamentales, cuando no existe tan siquiera una situación de hechos que amerite su ponderación. Las alegaciones del peticionario cobrarían alguna relevancia si en la situación de hechos del presente caso hubiese algún asomo de discrimen o arbitrariedad contra Igartúa De La Rosa a la hora de conceder dicha dispensa. No obstante, la situación de hechos del caso de marras dista sustancialmente de esas consideraciones.

Aquí el asunto medular es que Igartúa De La Rosa obtuvo en efecto la dispensa luego de haber sido presentada la querella por la Oficina de Ética Gubernamental.  Esto está estipulado por las partes y no existe controversia alguna sobre ello. Por lo que no proceden los argumentos sobre arbitrariedad y vaguedad del referido articulado, y mucho menos su invalidación, toda vez que se obtuvo la dispensa.

La Ley de Ética Gubernamental en sus artículos 3.3(e) y 3.3(h) deja abierta la posibilidad de una dispensa para la contratación proscrita, que como bien señala el Informe del Senado, se utiliza para situaciones excepcionales que a juicio del Gobernador, previa recomendación del Secretario de Justicia y del Secretario de Hacienda, benefician el interés público. Nótese que la dispensa debe obtenerse previo a la contratación, si se obtiene con posterioridad se habría violado la Ley de Ética Gubernamental y la dispensa operaría sólo como factor atenuante.

Precisamente, esto es lo que sucedió en el presente caso. Igartúa De La Rosa incurrió en la conducta que la Ley de Ética desea proscribir. Luego de presentada la querella, se obtuvo a manera de excepción la dispensa. No obstante, dicha dispensa fue retroactiva por lo que se consideró atenuante y no eximente de responsabilidad. En el caso ante nos no medió indicio alguno de que la referida dispensa se denegara arbitrariamente porque en efecto se otorgó a manera de excepción luego de haberse presentado la querella.

Conforme con lo anterior, el Tribunal de Circuito de Apelaciones actuó correctamente al otorgarle deferencia a la Oficina de Ética Gubernamental  y así confirmar la multa impuesta al querellado. Ciertamente, Igartúa De La Rosa contrató con un municipio mientras perteneció a la Junta de Gobierno del Banco de Fomento, y aunque obtuvo una dispensa retroactiva, ésta sólo le sirvió de atenuante. Por las

razones anteriores estamos conformes con la sentencia que hoy emite el Tribunal.


                    Federico Hernández Denton
                         Juez Asociado

razones anteriores estamos conformes con la sentencia que hoy emite el Tribunal.


                    Federico Hernández Denton
                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Oficina de Ética Gubernamental

      Recurrido

         v.

Gregorio Igartúa de la Rosa       CC-2000-144    Certiorari

      Peticionario

**Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez, a la cual se une el Juez Asociado señor Rebollo López.**

San Juan, Puerto Rico, a 4 de septiembre de 2002.

¿Actuó correctamente el Tribunal de Circuito de Apelaciones al confirmar la resolución emitida por la Oficina de Ética Gubernamental, en la cual se le impuso al peticionario una multa administrativa por violar el Artículo 3.3(e) de la Ley de Ética Gubernamental?[28] ¿Es un funcionario público, a los efectos de ese estatuto, un miembro de la Junta de Directores del Banco Gubernamental de Fomento, el cual representa al sector privado, y no recibe sueldo alguno por sus funciones? ¿Es el referido Artículo 3.3(e), _supra_, inconstitucional, por adolecer de vaguedad? Esas

---

[28] 3 L.P.R.A. sec. 1823(e).

son las interrogantes que ocupan la atención de este Tribunal.  Veamos.

## I

Analizaremos, en primer lugar, si un miembro de la Junta de Directores del Banco Gubernamental de Fomento, el cual representa al sector privado, se considera un funcionario público para efectos de la Ley de Ética Gubernamental, _supra_.  Para descargar tal ministerio, se hace necesario nuestra interpretación del contenido del Artículo 1.2(a) de la Ley de Ética Gubernamental.[29]  Dicho artículo dispone que un funcionario público "[i]ncluye aquellas personas que ocupan cargos o empleos en el Gobierno del Estado Libre Asociado de Puerto Rico que están investidos de parte de la soberanía del Estado, **por lo que intervienen en la formulación e implantación de la política pública**".  Es precisamente en torno a esta definición que gira parte de la controversia que tenemos ante nos.

El Artículo 14 del Código Civil de Puerto Rico[30] dispone que "[c]uando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu".  Hemos sostenido que ante la letra clara de la ley no debemos interpretar la misma para añadir elementos contrarios a la voluntad del legislador.[31]  No obstante, el propio Código Civil establece la importancia de considerar la voluntad del legislador al momento de interpretar las disposiciones de una ley.  A esos efectos, el Artículo 19 del Código Civil,[32] dispone lo siguiente:

> El medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas, es considerar la razón y espíritu de ella, o la

---

[29] 3 L.P.R.A. sec. 1802(a).

[30] 31 L.P.R.A. sec. 14.

[31] _Alejandro Rivera v. E.L.A._, 140 D.P.R. 538 (1996); y _Lasalle v. Junta Dir. A.C.A.A._, 140 D.P.R. 694 (1996).

[32] 31 L.P.R.A. sec. 19.

causa o motivos que indujeron al poder legislativo a dictarla.

A ese respecto, hemos expresado en repetidas ocasiones que la función del Tribunal es interpretar la ley y buscar la intención legislativa para darle efecto a la misma.[33] La razón del legislador al aprobar una ley es corregir un mal o promover alguna política pública, por lo que, al interpretar la ley, el Tribunal se tiene que asegurar que dicho propósito se cumpla.[34] La intención legislativa se puede desprender de la exposición de motivos del estatuto. No obstante, si no se desprende del mismo, es necesario indagar en otros documentos que surgen del récord legislativo para encontrarla. Entre los documentos a ser estudiados se incluyen, entre otros, los informes de las comisiones legislativas, anteproyectos de ley y los debates de la medida en el hemiciclo.[35]

¿A la luz del Artículo 1.2(a) de la Ley de Ética Gubernamental, supra, era el licenciado Igartúa de la Rosa un funcionario público, por el hecho de haber sido miembro de la Junta de Directores del Banco Gubernamental de Fomento? Contestamos dicha interrogante en la afirmativa.

Del examen de la Exposición de Motivos de la Ley Núm. 12 de 24 de julio de 1985, supra, conocida como la Ley de Ética Gubernamental, surge que el propósito legislativo fue limpiar la imagen de los funcionarios gubernamentales, que se había visto empañada por casos de corrupción gubernamental. El referido estatuto perseguía, además, evitar que las

---

[33] Chévere v. Levis, res. el 15 de marzo de 2000, 2000 T.S.P.R. 42, 150 D.P.R. _____ (2000), 2000 J.T.S. 56; Irizarry v. J&J Cons. Prods., Co., Inc., res. el 27 de enero de 2000, 2000 T.S.P.R. 15, 150 D.P.R. ___ (2000), 2000 J.T.S. 27; Monllor v. Soc. de Gananciales, 138 D.P.R. 600 (1995); Farmacias Moscoso, Inc. v. K-Mart Corp., 138 D.P.R. 497 (1995); González Pérez v. E.L.A., 138 D.P.R. 399 (1995).

[34] Chévere v. Levis, supra.

[35] Chévere v. Levis, supra; Irizarry v. J & J Cons. Prods., Co., supra.

personas envueltas en el ministerio de la administración pública incurrieran en dichos actos.

La Ley de Ética Gubernamental, supra, fue enmendada mediante la Ley Núm. 150 de 22 de diciembre de 1994, para, entre otras cosas, añadir en la definición de funcionario público a aquellas personas que participan en la implantación y formulación de la política pública. De la exposición de motivos del estatuto antes citado surge que el legislador tuvo la intención de evitar cualquier tipo de conflicto de interés de los funcionarios gubernamentales, y de evitar hasta la apariencia de tal conflicto.

Surge del Informe de la Comisión de Ética Gubernamental del Senado de Puerto Rico del 23 de junio de 1993, emitido con relación al P. del S. 50,[36] que en la medida legislativa se incluía, como funcionarios públicos para efectos de la Ley de Ética Gubernamental, supra, a los miembros de las diferentes Juntas Gubernamentales, aún cuando no recibieran compensación por sus servicios. Dichas personas habrían de estar obligados a cumplir con las disposiciones del referido estatuto.[37]

La participación de la Junta de Directores del Banco Gubernamental de Fomento en la implantación de la política pública del Estado surge del propio estatuto que crea dicha institución. El Artículo 1 de la Ley Núm. 17 de 23 de septiembre de 1948,[38] dispone lo siguiente:

> Para ayudar al Gobierno estadual en el desempeño de sus deberes fiscales y realizar más efectivamente su responsabilidad gubernamental de fomentar la economía de Puerto Rico, y especialmente su industrialización, por la presente se crea una corporación como instrumentalidad

---

[36] Este proyecto de ley se convirtió posteriormente en la Ley Núm. 150 de 22 de diciembre de 1994.

[37] El proyecto de ley fue aprobado por la Asamblea Legislativa de Puerto Rico, adoptando el informe de la Comisión de Ética Gubernamental sin realizar enmiendas al mismo.

[38] 7 L.P.R.A. sec. 551.

gubernamental del Gobierno estadual para actuar, por
autoridad del mismo, bajo el nombre de "Banco Gubernamental
de Fomento para Puerto Rico" (en lo sucesivo en las secs.
561 a 568 de este título denominado "el Banco").

De la antes citada disposición estatutaria podemos constatar que el Banco Gubernamental de Fomento es un brazo operacional del Gobierno de Puerto Rico en la implantación de su política pública fiscal y económica. Esta conclusión se reafirma con el contenido del Artículo 5 de la Ley Núm. 17 de 23 de septiembre de 1948, según enmendada,[39] el cual dispone que el propósito para la creación del Banco fue para ayudar al Gobierno de Puerto Rico a cumplir sus responsabilidades fiscales y a desarrollar la economía de la Isla. De la misma forma, el Artículo 3 de la Ley Núm. 272 de 15 de mayo de 1945[40] establece la obligación del Banco Gubernamental de Fomento de servir como agente consultor financiero del Gobernador de Puerto Rico y del Secretario de Hacienda en las cuestiones relacionadas con la emisión de deuda pública y del financiamiento de la obra pública.

Ahora bien, ¿cuál es la participación de los miembros de la Junta de Directores del Banco en la formulación y/o implantación de la política pública? La Carta Constitutiva del Banco Gubernamental de Fomento dispone que **"[l]os negocios del Banco serán administrados y sus poderes corporativos ejercidos por una Junta de Directores compuesta de siete miembros".**[41] Resulta obvio de esta disposición estatutaria que la implantación de la política pública formulada por el Banco y la manera de llevar a cabo sus negocios, están en manos de los miembros de su Junta de Directores. Éstos participan, por la naturaleza misma del Banco, en la formulación e implantación de la

---

[39] 7 L.P.R.A. sec. 553.

[40] 7 L.P.R.A. sec. 583.
[41] 7 L.P.R.A. sec. 552.

política pública, en términos fiscales y económicos, del Gobierno de Puerto Rico.

El licenciado Igartúa de la Rosa era miembro de la Junta de Directores del Banco Gubernamental de Fomento. El hecho de que no recibiera paga alguna por sus servicios, sino meramente el pago de dietas por su asistencia a las reuniones de la Junta, y de que representara el sector privado en la misma, no lo exime de la condición de funcionario público, ya que el legislador quiso incluir a esas personas dentro del alcance de la referida ley. Como miembro de la Junta de Directores del Banco Gubernamental de Fomento, el licenciado Igartúa de la Rosa participaba del proceso de formulación e implantación de la política pública del Banco. Ante esa realidad, concluimos que el licenciado Igartúa de la Rosa, como miembro de la Junta de Directores del Banco Gubernamental de Fomento, era un funcionario público a los efectos de la Ley de Ética Gubernamental, supra.

II

La Ley de Ética Gubernamental tiene el propósito, entre otras cosas, de evitar los conflictos de intereses de los funcionarios gubernamentales. El artículo 1.2(s) de la referida Ley, supra,[42] define el conflicto de intereses de la manera siguiente:

> (s) *Conflicto de intereses*.- Significa aquella situación en la que el interés personal o económico del servidor público o de personas relacionadas con éste, **está o puede razonablemente estar** en pugna con el interés público. (Énfasis nuestro.)

El artículo 3.3(e) de la antes mencionada Ley, supra, dispone que un funcionario público que desee contratar con una entidad gubernamental tiene que solicitar una dispensa antes de otorgar el

---

[42] 3 L.P.R.A. sec. 1802(s).

referido contrato. Al licenciado Igartúa de la Rosa se le imputó en la querella haber solicitado la referida dispensa tardíamente. Se le impuso una multa de tres mil dólares ($3,000) por ello. No obstante, de nuestro expediente surge que, una vez nombrado a la Junta de Directores del Banco Gubernamental de Fomento, el licenciado Igartúa de la Rosa le remitió una carta al entonces Secretario de Hacienda informándole de sus contratos con el Municipio de Aguadilla **y solicitándole la correspondiente dispensa**. De esa conducta se desprende claramente que el licenciado Igartúa de la Rosa tuvo la intención de cumplir con la ley, de cuyo texto surge específicamente que la dispensa la concederá el Gobernador con el consejo de los Secretarios de Hacienda y de Justicia.[43] De la prueba de autos surge que nunca se discutió en la referida Junta de Directores asunto alguno relacionado con el Municipio de Aguadilla durante su incumbencia en la misma. Tampoco surge que obtuviera el contrato con el Municipio debido a su cargo en la Junta de Directores del Banco, ya que la prueba de autos establece que el contrato existía desde antes de su nombramiento a esa Junta.

De la prueba de autos surge, además, que de la conducta observada por el licenciado Igartúa de la Rosa no se desprende asomo de conflicto de interés, ni mucho menos acto de corrupción alguno. Por el contrario, trasluce su intención de cumplir con la ley y de hacer públicos sus contratos con el municipio. Del cuadro fáctico determinado por la Oficina de Ética Gubernamental no surge una conducta

---

[43] Así se desprende del texto del artículo 3.3(e) de la Ley de Ética Gubernamental, supra. No obstante, el entonces Gobernador de Puerto Rico, honorable Rafael Hernández Colón, delegó esta función a la Oficina del Comisionado de Asuntos Municipales (OCAM) mediante la Orden Ejecutiva número OE-1991-86 de 17 de diciembre de 1991, cuando se tratara de contratos entre funcionarios públicos y algún municipio.

del aquí peticionario contraria a la intención legislativa detrás del estatuto en cuestión.

III

Nos corresponde pasar juicio sobre el planteamiento de inconstitucionalidad por vaguedad del Artículo 3.3(e) de la antes mencionada Ley, _supra_, en aquello que dispone sobre la solicitud de dispensas.

El aquí peticionario, licenciado Gregorio Igartúa de la Rosa, alega que la disposición contenida en el Artículo 3.3(e) de la Ley de Ética Gubernamental, _supra_, viola su derecho a un debido proceso de ley, porque el requisito sobre la necesidad de que los funcionarios públicos soliciten una dispensa al Gobernador para contratar con otras entidades gubernamentales, es vaga y se presta para su aplicación arbitraria.

La Constitución de Estados Unidos y la de Puerto Rico le garantizan a todos sus ciudadanos el debido proceso de ley. La referida garantía está contenida en el Artículo II, Sección 7,[44] de nuestra Constitución, la cual dispone lo siguiente:

> Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad **y al disfrute de la propiedad**. No existirá la pena de muerte. **Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.** No se aprobarán leyes que menoscaben las obligaciones contractuales. Las leyes determinarán un mínimo de propiedad y pertenencias no sujetas a embargo. (Énfasis nuestro.)

La Enmienda V de la Constitución de los Estados Unidos[45] dispone sobre tal extremo lo siguiente:

> Ninguna persona será obligada a responder por delito capital o infamante, sino en virtud de denuncia o acusación por un gran jurado, salvo en los casos que ocurran en las

---

[44] Documentos Históricos, 1 L.P.R.A., Art. II, sec. 7, pág. 280.

[45] Documentos Históricos, 1 L.P.R.A., Emda. Art. V, págs. 183-184.

fuerzas de mar y tierra, o en la milicia, cuando se hallen en servicio activo en tiempos de guerra o de peligro público; ni podrá nadie ser sometido por el mismo delito dos veces a un juicio que pueda ocasionarle la pérdida de la vida o la integridad corporal; ni será compelido en ningún caso criminal a declarar contra sí mismo, **ni será privado de su vida, de su libertad o de su propiedad, sin el debido procedimiento de ley**; ni se podrá tomar propiedad privada para uso público, sin justa compensación. (Énfasis nuestro.)

La garantía constitucional sobre el debido proceso de ley tiene dos vertientes, a saber: una sustantiva y una procesal.[46] La vertiente sustantiva protege los derechos y libertades que le concede la Constitución de Puerto Rico y la de Estados Unidos a los ciudadanos cuando el Estado formula política pública por vía legislativa y por reglamentación de las agencias del Poder Ejecutivo.[47] Por otro lado, en su vertiente procesal, el debido proceso de ley exige que el Estado le garantice un proceso justo a un ciudadano, cuando pretende privarlo de su vida, libertad o propiedad.[48] A esos efectos, nos expresamos en Rivera Rodríguez & Co. v. Lee Stowell, etc., supra,[49] de la manera siguiente:

> El debido proceso de ley se manifiesta en *dos* dimensiones distintas: sustantiva y procesal. Bajo el debido proceso *sustantivo*, los tribunales examinan la validez de una ley, a la luz de los preceptos constitucionales pertinentes, con el propósito de proteger los derechos fundamentales de las personas. Bajo este análisis, el Estado, al aprobar leyes o al realizar alguna actuación, no puede afectar de manera irrazonable, arbitraria o caprichosa los intereses de propiedad o libertad. Por otro lado, en el debido proceso de ley *procesal* se le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y propiedad del individuo se haga a través de un procedimiento que sea justo y equitativo. (Citas omitidas.)

---

[46] Pres. del Senado, res. el 30 de junio de 1999, 99 T.S.P.R. 104, 148 D.P.R. ___ (1999), 99 J.T.S. 110; Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 D.P.R. 881 (1993).

[47] Íd.

[48] Íd.

[49] Págs. 887-888.

Hemos establecido una serie de requisitos para cumplir con el debido procedimiento de ley en el ámbito procesal al momento de llevarse a cabo un procedimiento adjudicativo por parte del Estado. Se trata de los requisitos siguientes: (1) notificación adecuada del proceso; (2) proceso ante un funcionario imparcial; (3) oportunidad de ser oído; (4) derecho a contrainterrogar testigos y examinar evidencia presentada en su contra; (5) tener asistencia de abogado; y (6) que la decisión se base en el récord.[50]

En el caso ante nuestra consideración, analizaremos el estatuto en cuestión tomando como norte el debido proceso de ley sustantivo que cobija a los ciudadanos frente a la disposición estatutaria.  Veamos.

IV

En la esfera federal se ha discutido extensamente la doctrina de la vaguedad de un estatuto.  Esta doctrina emerge como consecuencia del principio constitucional que le garantiza a los ciudadanos un debido proceso de ley.[51]  La doctrina de vaguedad de una ley se utiliza para evaluar, por ejemplo, leyes que restringen la libertad de expresión y estatutos penales, entre otros.[52]

La referida doctrina postula, **como un principio cardinal del debido proceso de ley**, que un estatuto es inconstitucional por adolecer de vaguedad, cuando falla en proveerle un aviso razonable a los ciudadanos de las conductas que proscribe, o cuando no le provee suficientes guías a los funcionarios que están encargados de ponerla

---

[50] <u>Rivera Rodríguez & Co. v. Lee Stowell, etc.</u>, <u>supra</u>.

[51] <u>Kolender v. Lawson</u>, 461 U.S. 352 (1982); <u>Smith v. Goguen</u>, 415 U.S. 566 (1973); y <u>Grayned v. City of Rockford</u>, 408 U.S. 104 (1971).  Véase, además, W.B. Lochart, Et. Als., <u>The American Constitution, Cases and Materials</u>, Fifth Edition, St. Paul, Minn.: West Publishing Co., 1981; y L.H. Tribe, <u>American Constitutional Law</u>, Second Edition, Mineola, New York: The Foundation Press, Inc., 1988.

[52] <u>City of Chicago v. Morales</u>, 527 U.S. 41 (1999); y R. D. Rotunda and J.E. Nowak, <u>Treatise on Constitutional Law, Substance and Procedure</u>, Third Edition, St. Paul, M.N.: West Group (1999).

en vigor; permitiendo así su aplicación arbitraria y discriminatoria.[53]

Los fundamentos en que se sostiene la doctrina de vaguedad de un estatuto están claramente formulados por el Tribunal Supremo de Estados Unidos en <u>Grayned v. City of Rockford</u>, <u>supra</u>,[54] donde se dispuso lo siguiente:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.  Vague laws offend several important values.  First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning. **Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.  A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.** (Énfasis nuestro; notas al calce omitidas.)
>
>                     ...
>
> El permitir que los funcionarios encargados de aplicar una ley

penal, o que intervenga con los derechos constitucionales de los individuos, lo hagan de manera arbitraria o caprichosa, y utilizando como único criterio su voluntad o preferencias es constitucionalmente impermisible.[55]  De hecho, es precisamente **la posibilidad** de que la ley pueda ser aplicada de manera arbitraria y discriminatoria, por no existir guías que delimiten la discreción de los funcionarios gubernamentales, lo que viola el principio constitucional del debido proceso de ley.[56]  La importancia de que el legislador establezca guías adecuadas para limitar la discreción de los funcionarios encargados de implantar las leyes de naturaleza penal o punitiva es tal, que el

---

[53] <u>City of Chicago v. Morales</u>, <u>supra</u>; <u>Kolender v. Lawson</u>, <u>supra</u>; <u>Smith v. Goguen</u>, <u>supra</u>; <u>Grayned v. City of Rockford</u>, <u>supra</u>.

[54] Págs. 108-109.

[55] <u>City of Chicago v. Morales</u>, <u>supra</u>; <u>Kolender v. Lawson</u>, <u>supra</u>; <u>Smith v. Goguen</u>, <u>supra</u>; <u>Papachristou v. City of Jacksonville</u>, 405 U.S. 156 (1972).

Tribunal Supremo de Estados Unidos ha resuelto que la premisa más importante de la doctrina de vaguedad de una ley descansa sobre la ausencia de las antes mencionadas guías.[57] El mejor ejemplo de la importancia que reviste la ausencia de guías adecuadas en una ley penal lo encontramos en la expresión del Tribunal Supremo de los Estados Unidos en Kolender v. Lawson, supra,[58] donde se dispuso lo siguiente:

> Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine "is not actual notice, but the other principal element of the doctrine-the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections". (Citas omitidas.)

Establecidas las bases de la doctrina de la vaguedad de un estatuto, según interpretada en la esfera federal, nos corresponde analizar el tratamiento brindado a dicha doctrina en la jurisdicción local. Veamos.

V

Al igual que en la esfera federal, la doctrina de inconstitucionalidad por vaguedad de una ley ha sido discutida en repetidas ocasiones por esta Curia al analizar la disposición que garantiza el debido proceso de ley en la Constitución de Puerto Rico. Hemos resuelto que una ley adolece de vaguedad si sus prohibiciones no están claramente definidas.[59] En O.E.G. v. Cordero, Rivera[60] expresamos que una ley es nula por vaguedad, cuando sus prohibiciones no están definidas claramente **o cuando no previenen la aplicación**

---

[56] Smith v. Goguen, supra.

[57] Kolender v. Lawson, supra; Smith v. Goguen, supra.

[58] Págs. 357-358.

[59] Pacheco Fraticelli v. Cintrón Antonsanti, 122 D.P.R. 229 (1988).

**arbitraria de las mismas, por no proveerle al funcionario encargado de su aplicación normas claras y precisas que guíen su discreción.**  La doctrina de vaguedad de una ley aplica cuando se trata de estatutos penales, aún cuando los mismos no restrinjan el derecho a la libertad de expresión, y está íntimamente relacionada con el debido proceso de ley garantizado por nuestra Constitución.[61]  La doctrina de vaguedad descansa sobre la premisa de que los estatutos deben dar un aviso razonable a la ciudadanía sobre lo que está prohibido y, además, deben proveer a aquellos que las aplican normas claras que prevengan la aplicación arbitraria o discriminatoria del estatuto.[62]

En Pacheco Fraticelli v. Cintrón Antonsanti, supra, establecimos que el Estado y sus subdivisiones políticas tienen la facultad inherente de establecer reglamentación, **pero es su obligación proveer guías y normas adecuadas para evitar la aplicación arbitraria de dicha reglamentación por parte de los funcionarios encargados para ello.**  Una ley que no le provee un aviso adecuado al ciudadano de inteligencia común sobre los aspectos que prohíbe, o que deja la puerta abierta para la aplicación arbitraria y caprichosa de la misma por parte de los funcionarios gubernamentales, viola el principio básico del debido proceso de ley y es nula por vaguedad.[63]

**Una ley es inconstitucional de su faz no por la forma particular en que se empleó en un determinado caso, sino por la posibilidad de**

---

[60] Res. el 21 de agosto de 2001, 2001 T.S.P.R. 118, 154 D.P.R. ___ (2001), 2001 J.T.S. 119, pág. 6.

[61] U.N.T.S. v. Srio. de Salud, 133 D.P.R. 153 (1993).

[62] O.E.G. v. Cordero, Rivera, supra, (Op. Concurrente del Juez Asociado señor Corrada del Río).

[63] Velázquez Pagán v. A.M.A., 131 D.P.R. 568 (1992); Pacheco Fraticelli v. Cintrón Antonsanti, supra; Vives Vázquez v. Tribunal Superior, 101 D.P.R. 139 (1973).

**que pueda aplicarse de manera arbitraria o inconsistente en otras situaciones.**[64]

VI

Nos corresponde evaluar la disposición estatutaria en cuestión, a la luz de la doctrina antes expuesta, para determinar si en efecto es nula por vaguedad. No podemos perder de perspectiva que el Artículo 3.3(e) de la Ley de Ética Gubernamental, supra, establece una serie de penalidades por violar sus disposiciones. Por lo tanto, nos encontramos ante una ley que debe analizarse de acuerdo con las doctrinas e interpretaciones aplicables a las leyes penales. Veamos.

El referido Artículo 3.3(e) de la Ley de Ética Gubernamental, supra, dispone lo siguiente:

(e) Ningún funcionario o empleado público podrá ser parte o tener algún interés en las ganancias o beneficios producto de un contrato con cualquier otra agencia ejecutiva o dependencia gubernamental **a menos que el Gobernador, previa recomendación del Secretario de Hacienda y del Secretario de Justicia, expresamente lo autorice.** Sólo podrá llevarse a cabo la contratación en el caso previsto en este inciso sin solicitar y obtener la autorización del Gobernador cuando se trate de:

(1) Contratos por un valor de $3,000.00 ó menos y ocurran una sola vez durante cualquier año fiscal.

(2) Contratos de arrendamiento, permuta, compraventa, préstamo, seguro hipotecario o de cualquier otra naturaleza que se refieran a una vivienda y/o solar provisto o a ser financiado o cuyo financiamiento es asegurado o garantizado por una agencia gubernamental.

(3) Programas de servicios, préstamos, garantías e incentivos auspiciados por agencias gubernamentales.

En los casos especificados en las cláusulas (2) y (3) de este inciso la agencia contratante autorizará las transacciones siempre que concurran los siguientes requisitos:

(A) Se trate de contratos, préstamos, seguros, garantías o transacciones accesibles a cualquier ciudadano que cualifique.

(B) Las normas de elegibilidad sean de aplicación general.

---

[64] Íd.

(C) El funcionario o empleado público cumpla con todas las normas de elegibilidad y no se le otorgue directa o indirectamente un trato preferente o distinto al del público en general. (Énfasis nuestro.)

En su Artículo 3.3(h),[65] la Ley de Ética Gubernamental autoriza al Director de la OEG a imponer multas administrativas a los funcionarios que violen las disposiciones del Artículo 3.3(e) de la referida Ley, supra. De acuerdo con la disposición estatutaria antes citada, la multa no podrá ser mayor de cinco mil dólares ($5,000), según lo dispone la sección 7.1 de la Ley de Procedimiento Administrativo Uniforme.[66]

La Ley de Ética Gubernamental, supra, le **impone responsabilidad penal a aquellos funcionarios que violen algunas de sus disposiciones**. A esos efectos, el Artículo 3.8 de la Ley de Ética Gubernamental[67] dispone lo siguiente:

(a) *Acciones de naturaleza penal.-*

(1) Toda persona que viole intencionalmente las prohibiciones y disposiciones establecidas en los incisos (c), (d), (e) y (g) de la sec. 1822, **en los incisos (b), (c), (d) y (e) de la sec. 1823,** en la sec. 1824 y en la sec. 1827, todos de este título, **incurrirá en delito grave y convicta que fuere, será sancionada por cada violación con pena de reclusión por un término fijo de un año o con multa de dos mil (2,000) dólares; o ambas penas a discreción del tribunal.**
**De mediar circunstancias agravantes la pena fija establecida podrá ser aumentada hasta un máximo de dos (2) años o hasta tres mil (3,000) dólares. De mediar circunstancias atenuantes la pena podrá ser reducida hasta un mínimo de nueve (9) meses o hasta mil (1,000) dólares.**

(2) ...

(3) ...

(4) La persona convicta por los delitos establecidos en este subcapítulo no tendrá el beneficio de sentencia suspendida. (Énfasis nuestro.)

---

[65] 3 L.P.R.A. sec. 1823(h).

[66] 3 L.P.R.A. sec. 2201.

[67] 3 L.P.R.A. sec. 1828(a).

De las disposiciones estatutarias antes citadas surge de manera clara e inequívoca el carácter penal y punitivo que tiene el Artículo 3.3(e) de la Ley de Ética Gubernamental, supra. Ante esta realidad, se hace imperativo la aplicación estricta de la doctrina de vaguedad al evaluar el mismo.

En el caso de contratos de funcionarios públicos con algún municipio, la tarea de conceder las referidas dispensas fue encomendada al Comisionado de Asuntos Municipales, mediante la Orden Ejecutiva del Gobernador Núm. OE-1991-86, de 17 de diciembre de 1991.[68]

**Como se puede apreciar, del texto del Artículo 3.3(e) de la Ley de Ética Gubernamental, supra, no se desprenden guías ni normas claras y específicas que tiendan a evitar la arbitrariedad o aplicación caprichosa de sus disposiciones. No establece los criterios que utilizará el Gobernador o Gobernadora, o el funcionario designado por el Primer Ejecutivo, para conceder tales dispensas. No se establecen los criterios para denegarlas. Tampoco surge del referido estatuto el criterio o norma que guíe la discreción de tal funcionario, ni un procedimiento que le sirva de guía a los distintos funcionarios que necesiten solicitar la concesión de esa dispensa.** Hemos examinado el Reglamento de Ética Gubernamental[69] y **no contiene disposición alguna que establezca las referidas guías o criterios necesarias para que el Comisionado de Asuntos Municipales conceda o deniegue las referidas dispensas.** De acuerdo con el Artículo 2.4(h) de la Ley de Ética Gubernamental,[70] el Director de dicha Oficina tiene el deber de promulgar aquellas reglas y reglamentos que sean necesarios para hacer

---

[68] Esta delegación fue realizada al amparo de lo dispuesto en la Ley Núm. 104 de 28 de junio de 1956, 3 L.P.R.A. sec. 1a.

[69] Reglamento Núm. 4827, 20 de noviembre de 1992, 23 de noviembre de 1992.
[70] 3 L.P.R.A. sec. 1814(h).

cumplir los propósitos y disposiciones del estatuto. Las lagunas que pudiesen existir en la antes mencionada ley **podían** y **debían** ser suplidas por el Reglamento de Ética Gubernamental, <u>supra</u>.[71] Tampoco existe una Orden Ejecutiva emitida por el Gobernador(a) de Puerto Rico que contenga tal alcance.

Concluimos que el Artículo 3.3(e) de la Ley de Ética Gubernamental, <u>supra</u>, no establece los parámetros dentro de los cuales se podría conceder o denegar tal dispensa, a tenor con la intención del legislador al aprobar dicho estatuto. Como mencionáramos anteriormente, la intención del legislador al aprobar la Ley de Ética Gubernamental, <u>supra</u>, fue la de combatir la corrupción gubernamental y evitar los conflictos de intereses de parte de los funcionarios públicos. No obstante, ni el estatuto, ni el Reglamento de Ética Gubernamental, <u>supra</u>, formulan criterios tan fundamentales para la aplicación de la ley, como qué conducta constituye o no un potencial conflicto de intereses por parte del funcionario público que intenta establecer una relación contractual con una agencia o instrumentalidad pública. Tampoco establece qué constituye, o no, conducta impropia de parte del funcionario público. Tanto el estatuto como el Reglamento antes citado, dejan en manos de la absoluta discreción del funcionario que designe el Primer Ejecutivo la tarea de concluir sobre la concesión de tal dispensa, sin las guías necesarias para ejercer tal discreción. No hay duda alguna, que su concesión o denegación queda al total arbitrio y/o capricho de ese funcionario gubernamental. Como resultado de la falta de normas adecuadas en la Ley y el Reglamento antes citados, la aplicación del estatuto **podría** resultar arbitraria y caprichosa. **El estatuto permite su aplicación de una manera distinta**

---

[71] <u>Chabrán v. Bull Insular Line</u>, 69 D.P.R. 269 (1948); y <u>Puerto Rico Ilustrado v. Buscaglia, Tes.</u>, 64 D.P.R. 914 (1945).

**en cada situación particular, dejando al ciudadano común en total incertidumbre y a la merced del capricho o voluntad del funcionario que tenga la responsabilidad de aplicarlo.** El funcionario encargado tiene la libertad, por permitírselo el estatuto, de utilizar criterios exógenos a la ley para disponer de una solicitud de dispensa. Toda esta situación constituye una crasa violación al debido proceso de ley que la Constitución de Puerto Rico le garantiza a sus ciudadanos.

Concluimos, pues, que el Artículo 3.3(e) de la Ley de Ética Gubernamental, supra, viola el debido proceso de ley garantizado por la Constitución de Estados Unidos y la de Puerto Rico, y es inválido por adolecer de vaguedad.

Nos parece encomiable, y está revestido del más alto interés público, el propósito legislativo detrás de la Ley de Ética Gubernamental, supra, de combatir la corrupción. No obstante, los derechos constitucionales que le garantiza a la ciudadanía la Constitución de Puerto Rico y la de Estados Unidos tienen que salvaguardarse frente al interés apremiante del Estado de perseguir su propósito legislativo. El legislador formuló su política pública anticorrupción mediante el estatuto que aquí nos concierne y, además, le impuso a la Oficina de Ética Gubernamental la obligación de aprobar un reglamento para implantarla. En dicho cuerpo reglamentario deben ser incluidos los criterios detallados y específicos, que sirvan el propósito de guiar y evitar la arbitrariedad de los funcionarios encargados de implantar esa política pública. Estos criterios deben servir, además, el propósito apremiante y fundamental de instruir a los ciudadanos acerca de la conducta proscrita, por imperativo constitucional de la garantía a un debido proceso de ley. Si bien es cierto que combatir la corrupción constituye un interés público apremiante, no es menos cierto que el mismo no puede alcanzarse a costa

de la libertad individual y los derechos que le garantiza a la ciudadanía la Constitución de Puerto Rico y la de Estados Unidos.

## VII

Por los fundamentos antes expuestos, revocaríamos la resolución dictada por el Tribunal de Circuito de Apelaciones, así como la emitida por la Oficina de Ética Gubernamental, y declararíamos inválido el Artículo 3.3(e) de la Ley de Ética Gubernamental, _supra_, por ser vago y ambiguo y, como consecuencia, violatorio de la garantía a un debido proceso de ley, derecho protegido por la Constitución de Estados Unidos y la de Puerto Rico.

Efraín E. Rivera Pérez
Juez Asociado