EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Parque Ecuestre La Esmeralda, Inc.<br><br>    Peticionario<br><br>            v.<br><br> Junta Hípica de la Administración<br> y el Deporte Hípico<br><br>       Recurrida | Certiorari<br><br>2004 TSPR 178<br><br>163 DPR \_\_\_\_ |

Número del Caso: CC-2003-909

Fecha: 15 de noviembre de 2004

Tribunal de Circuito de Apelaciones:

                    Circuito Regional V de Ponce y Aibonito

Juez Ponente:

            Hon. German J. Brau Ramírez


Abogada de la Parte Peticionaria:

            Lcda. Katarina Stipec Rubio


Abogados de la Parte Recurrida:

            Lcdo. Armando Martínez Fernández
            Lcda. Amanda Acevedo Rhodes


Materia: Revisión Decisión Administrativa de la Administración de la
        Industria y el Deporte Hípico

Este documento constituye un documento oficial del Tribunal Supremo
que está sujeto a los cambios y correcciones del proceso de
compilación y publicación oficial de las decisiones del Tribunal.
Su distribución electrónica se hace como un servicio público a la
comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Parque Ecuestre La Esmeralda,
Inc.

    Peticionario


       vs.                    CC-2003-909     Certiorari

Junta Hípica de la Adminis-
tración y el Deporte Hípico

    Recurrida


SENTENCIA


San Juan, Puerto Rico, a 15 de noviembre de 2004.


    El 3 de diciembre de 2003 la peticionaria, Parque Ecuestre La Esmeralda, Inc., acudió ante nos para solicitar la revisión judicial de una Resolución dictada por el entonces Tribunal de Circuito de Apelaciones el 16 de septiembre de 2003. Mediante dicha Resolución, el foro apelativo denegó la revisión judicial de la determinación de la Junta Hípica, emitida el 27 de mayo de 2003, mediante la cual dicho agencia administrativa denegó la licencia solicitada por la parte peticionaria para operar un hipódromo y celebrar carreras de caballo en el sur de Puerto Rico.

Examinado detenidamente el recurso presentado por la peticionaria, a la luz de los referidos dictámenes del Tribunal de Apelaciones y de la Junta Hípica, estimamos que la peticionaria tiene razón en sus planteamientos. Por ende, se revoca la Resolución emitida por el Tribunal de Apelaciones el 16 de septiembre de 2003 y la Resolución de la Junta Hípica del 27 de mayo de 2003, y se ordena la devolución del caso a la Junta Hípica para que evalúe nuevamente la solicitud de Parque Ecuestre La Esmeralda, Inc.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió Opinión de Conformidad, a la cual se une la Juez Asociada señora Rodríguez Rodríguez. El Juez Asociado señor Rivera Pérez disiente sin opinión. El Juez Presidente señor Hernández Dentón está inhibido. El Juez Asociado señor Rebollo López no intervino.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Parque Ecuestre La Esmeralda,
Inc.

    Peticionario


      vs.                              CC-2003-909
    Certiorari


Junta Hípica de la Adminis-
tración y el Deporte Hípico

    Recurrida


Opinión de Conformidad emitida por el Juez Asociado señor FUSTER BERLINGERI, a la cual se une la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ.


        San Juan, Puerto Rico, a 15 de noviembre de 2004.


        El 7 de agosto de 2000 Parque Ecuestre La Esmeralda, Inc. (en adelante Parque Ecuestre) solicitó ante la Junta Hípica (en adelante la Junta) una licencia bajo la Ley de la Industria y el Deporte Hípico de Puerto Rico, Ley Núm. 83 de 2 de julio de 1987, 15 L.P.R.A. secs. 198-198s, según enmendada, para operar un hipódromo y celebrar carreras de ejemplares hípicos en el área sur de la Isla. El nuevo hipódromo habría de construirse en terrenos pertenecientes a la corporación Emerald Princess, Inc, y que ubican en el Municipio de Santa Isabel. El hipódromo contaría además con diversas facilidades dirigidas a fomentar el deporte hípico

en Puerto Rico.[1] En efecto, aun la propia Junta reconoció que se trataba de una propuesta para un hipódromo con facilidades extraordinarias, que no las tenía el actual hipódromo que existe en Puerto Rico.

Como parte del procedimiento para considerar la solicitud de la referida licencia, el 16 de agosto de 2000 la Junta le ordenó a la peticionaria presentar documentación relativa a: (1) la viabilidad económica de un segundo hipódromo en Puerto Rico; (2) el financiamiento del proyecto; (3) información pertinente a accionistas, directores y oficiales de las corporaciones Emerald Princess y Parque Ecuestre La Esmeralda, Inc., incluyendo sus estados financieros y certificados de antecedentes penales, debiendo acreditar además la existencia jurídica

---

[1] Las facilidades con las que contaría el hipódromo, según la propuesta presentada por la peticionaria, serían, entre otras, las siguientes: Pista de grama de una milla con un chute de 250 metros; pista de arena de una milla y un octavo con dos chutes de 300 y 150 metros, respectivamente; tramos de 800 metros sin curva; facilidades para clases de equitación, competencias de paso fino, salto y "dressage"; establos en condominio; edificio principal con palcos para prensa, Administrador, Junta Hípica y privados; "Grand Stand", Casa Club y restaurante; club para dueños de ejemplares e invitados; estacionamiento; pabellón de ventas, concesionario y establos para 100 ejemplares; área de servicios con oficinas; área para equipo de mantenimiento de pista y vivero de plantas; salón de actividades y áreas recreativas para empleados de cuadras; piscina para ejercitar los caballos; sistema de alumbrado para carreras nocturnas; altoparlantes y pizarra electrónica; monitores de circuito cerrado para la Casa Club y el "Grand Stand"; estudio de televisión; sistema de transportación gratuita de ejemplares; dormitorios para empleados que atiendan ejemplares residentes; facilidades para el Jurado Hípico, jueces de llegada y "chart callers" de la Revista Hípica; salones para jinetes femeninos y masculinos; guardería para niños; y sistema electrónico de apuestas.

de ambas corporaciones. La peticionaria presentó todos los documentos requeridos.

Luego de múltiples incidentes procesales, se celebró una vista pública donde se presentaron ponencias de representantes de diversos sectores del hipismo en Puerto Rico. Por su parte, la peticionaria presentó prueba pericial en torno a la viabilidad económica del proyecto propuesto.

Representantes de diversos sectores de la industria hípica comparecieron a deponer u opinar sobre la construcción del nuevo hipódromo, entre ellos: la Confederación Hípica de Puerto Rico, que agrupa dueños de caballos, la Asociación de Jinetes, la Asociación de Entrenadores, la Asociación de Criadores, varios criadores individuales, la Hermandad Puertorriqueña de Agentes Hípicos, el Alcalde del Municipio de Santa Isabel, el Alcalde de Salinas, la Compañía de Fomento Industrial, a través de la Oficina del Director de Desarrollo y Presupuesto, la Compañía de Turismo de Puerto Rico, a través de la Subdirectora Ejecutiva de Planificación y Desarrollo, el Departamento de Desarrollo Económico y Comercio, Doral Securities, Inc., el Lcdo. Abelardo Ruiz Suria y el Centro Comercial Plaza Esmeralda, Inc., **todos a favor de la construcción del nuevo hipódromo**. Sólo compareció en oposición al proyecto el Comandante Management Company, LLC, la compañía que controlaba y

administraba el único hipódromo existente en Puerto Rico, el Hipódromo El Comandante.

La Junta Hípica denegó la licencia solicitada mediante una resolución emitida el 27 de mayo y notificada el 28 de mayo de 2003. Detalló los siguientes como los fundamentos de su denegatoria: (1) que la peticionaria no había probado que fuera económicamente viable la operación simultánea de dos hipódromos en Puerto Rico ni presentó una carta-compromiso firme de financiamiento; (2) que la peticionaria no poseía un plan para el sistema electrónico de apuestas; (3) que los ejemplares existentes eran insuficientes para compartirlos entre dos hipódromos; (4) que la peticionaria no había demostrado que los empleados y la empresa operadora del Comandante no se afectarían por la construcción de un nuevo hipódromo; (5) en cuanto a la necesidad de transportar los ejemplares entre uno y otro hipódromo, que no se había analizado el factor riesgo y los costos; y (6) que la construcción de un nuevo hipódromo implicaría dividir los días de carreras, lo cual no traería beneficio alguno a la industria hípica.

El 17 de junio de 2003 Parque Ecuestre solicitó la reconsideración de la denegatoria referida, la cual fue declarada sin lugar el 19 de junio de 2003.

Ante la negativa de la Junta, Parque Ecuestre presentó una petición de revisión en el Tribunal de Circuito de Apelaciones el 29 de julio de 2003. Ese tribunal se negó a intervenir aludiendo a la deferencia que merece la Junta

Hípica por su carácter de agencia administrativa. Esta determinación fue hecha mediante una resolución dictada el 16 de septiembre y notificada 24 de septiembre de 2003.

Inconforme con el dictamen referido, la peticionaria acudió ante el Tribunal Supremo el 3 de diciembre de 2003 e hizo el siguiente señalamiento:

> **"Erró la Junta Hípica al denegar la petición para operar un hipódromo a base de criterios contrarios a la ley, no contemplados en la misma y que no forman parte del Reglamento Hípico."**

El 16 de enero de 2004 se expidió el recurso solicitado. La peticionaria presentó su alegato el 5 de abril de 2004. La recurrida presentó el suyo el 6 de mayo de 2004.

II

La Junta Hípica es el organismo facultado mediante la Ley de la Industria y el Deporte Hípico (en adelante la Ley), 15 L.P.R.A. secs. 198-198s, para "reglamentar todo lo concerniente al deporte hípico". El Artículo 6(b) de dicha Ley, 15 L.P.R.A. sec. 198e(b) dispone, en lo pertinente:

> La Junta tendrá facultades para, entre otras cosas:
>
> (1) Establecer los requisitos, que a su juicio deberá reunir <u>todo hipódromo</u> para operar como tal; establecer los términos y condiciones para el cumplimiento de dichos requisitos; extender licencias provisionales durante el término que se conceda <u>a los dueños de hipódromos</u> para cumplir los requisitos que establezca la Junta; cancelar toda licencia que se expida con carácter provisional a sus tenedores si no se cumplieren los términos de ella; exigir requisitos adicionales a los establecidos originalmente, garantizar la

seguridad pública, honestidad e integridad del deporte hípico.

(2) Autorizar expresamente los días y lugar en que cada hipódromo habrá de celebrar carreras de caballos pura sangre en Puerto Rico y podrá transferir el lugar y los sitios, señalados para las mismas. Disponiéndose, que la Junta autorizará un mínimo de ciento ochenta (180) días de carreras en el año natural. La repartición de los días hábiles de carreras deberá hacerse razonablemente entre los hipódromos, velando siempre por el bienestar general del hipismo.

. . .

(5) Prescribir por reglamento los requisitos que deberán reunir las personas naturales y jurídicas que se dediquen a cualquier actividad hípica; . . . Nada impedirá a los dueños de caballos, potreros y criadores ser accionistas de empresas operadoras de hipódromos en Puerto Rico.

. . .

(7) Declarar, a petición del Administrador Hípico, de las personas naturales o jurídicas autorizadas a operar hipódromos en Puerto Rico . . .(Énfasis suplido).

No obstante, la discreción que se le ha otorgado a la Junta para determinar si concede licencias de hipódromos no es absoluta. El Artículo 16(a) establece una de las referidas limitaciones:

No se concederá o renovará licencia de índole alguna en la actividad hípica a personas que hubiesen sido convictas por violación de cualesquiera de las disposiciones de las secs. 2101 et seq. del Título 24, conocidas como "Ley de Sustancias Controladas de Puerto Rico", o que hayan sido convictas de delito grave, o de delito menos grave que implique depravación moral. 15 L.P.R.A. sec. 1980.

La propia Junta Hípica ha limitado su discreción delineando mediante un reglamento los procedimientos y requisitos que tienen que cumplir las personas que interesen obtener una licencia para operar un hipódromo. La Sección II-A del Reglamento Hípico contiene el procedimiento a seguir para obtener una licencia para operar un hipódromo:

201. No se abrirá al público ni se operará ningún hipódromo en Puerto Rico dedicado a celebrar carreras de caballos sin una licencia otorgada por la Junta.

202. Toda persona natural o jurídica interesada en la operación de un hipódromo deberá radicar una petición al efecto ante la Junta y suministrar toda la información y documentación que le sea requerida.

203. Antes de otorgar o renovar una licencia de hipódromo, la Junta celebrará audiencia y dará la oportunidad de expresarse a todos los interesados y a las agencias e instrumentalidades del gobierno concernidas. El solicitante hará publicar los anuncios y edictos que ordene la Junta en relación con dichas audiencias.

204. Antes de otorgar la licencia, la Junta impondrá al solicitante las condiciones y requisitos mínimos bajo las cuales operará el hipódromo y las mismas formarán parte de la licencia de hipódromo si ésta fuera concedida.

....

214. No se otorgará o renovará licencia de hipódromo a ninguna persona que:

1. Sea miembro, empleado o funcionario de la Administración o agente hípico.

2. Haya sido convicto de delito grave o menos grave que implique depravación moral.

3. Esté asociado o tenga interés en cualquier negocio o actividad con alguna persona que

haya sido convicta de violar la "Ley de Sustancias Controladas".

4. Tenga una suspensión o cancelación de su licencia en algún hipódromo del exterior o haya sido encontrado culpable de prácticas ilícitas o perjudiciales del deporte hípico en cualquier hipódromo de Puerto Rico o el exterior.

5. Se niegue a cumplir o entorpeciere el cumplimiento de la Ley o el Reglamento, Reglas, Resoluciones y Órdenes de la Junta y el Administrador.

6. Se niegue a someterse a un examen antidroga de serle requerido por el Administrador.

215. La Junta podrá establecer requisitos adicionales de los que originalmente se establecieron para obtener la licencia de hipódromo. Se le ofrecerá al poseedor de la licencia de hipódromo la oportunidad de discutir los nuevos requerimientos en vista pública para esos propósitos por sí mismo o por medio de sus abogados.

Es requisito además que durante su operación el hipódromo contemplado cuente con las facilidades dispuestas en la Regla 2108 del Reglamento Hípico, según enmendado:

1. Tener una pista de por lo menos una milla.

2. Disponer de por lo menos 2 portones de salida.

3. Disponer de un sistema electrónico para las apuestas.

4. Disponer de equipo para tomar mecánica o electrónicamente el tiempo fraccional y el tiempo total de cada carrera.

5. Disponer de equipo para fotografiar en película o en cinta video magnetofónica el desarrollo de las carreras o cualquier otro sistema autorizado por el Administrador y proyectar al público apostador las carreras vía televisión, y previa autorización de la Junta, otras formas de transmisión visual, en transmisión

simultánea con la celebración de la carreras, conservando copia de éstas por un período a ser dispuesto por el Administrador Hípico, así como a petición particular del Administrador Hípico, el Jurado Hípico o la Junta Hípica.

6. Disponer de un adecuado sistema de altoparlantes, así como un sistema adecuado de comunicaciones con los funcionarios y empleados que se desempeñan en los días de carreras.

7. Disponer de un servicio de ambulancias debidamente equipadas.

8. Mantener abierta diariamente la sala de emergencia a cargo de un doctor y un enfermero autorizado.

9. Mantener debidamente uniformada una guardia a toda hora.

10. Tener un área de establos con aquel número de jaulas que la Junta determine.

11. Tener un área y facilidades para la toma de muestras de orina, sangre, secreción nasal o transpiración.

12. Tener un local adecuadamente equipado para llevar a cabo las inscripciones para las carreras.

13. Mantener graderías, cantinas y "restaurant" de primera clase.

14. Mantener y conservar en forma atractiva los alrededores del hipódromo.

15. Designar de común acuerdo con la Junta y el Administrador el área de acomodo para uso exclusivo de éstos y sus invitados durante los días de carreras.

16. Designar y tener a su costo un médico quien deberá estar en el hipódromo a las órdenes del Jurado durante los días de carreras desde la hora que fije el Administrador.

17. El equipo y facilidades que se mencionan como requisitos mínimos, se sobreentiende que deberán estar en buen estado de funcionamiento y en su lugar correspondiente para los usos que se destinen.

18. Mantener los servicios de no menos de dos ujieres debida y adecuadamente uniformados.

19. Tener un área con una piscina para ejercitar los ejemplares de carreras.

20. Tener un sistema de alumbrado eléctrico suficiente para celebrar las carreras al oscurecer.

21. Designar de común acuerdo con los dueños de caballos o sus representantes el área de acomodo para uso exclusivo de éstos y sus invitados durante los días de carreras.

22. Proveer un área de estacionamiento rotulado, accesible y protegido a cada uno de los Miembros del Jurado, la Junta Hípica y el Administrador Hípico a ser aprobados por éstos.

23. Mantener en las facilidades del hipódromo, en común acuerdo con el Administrador Hípico, un área de escuela y un área de establos designada para uso exclusivo de la Escuela Vocacional Hípica, cuyos requisitos serán establecidos por el Administrador Hípico.

24. Mantener un adecuado sistema de computadora con sus respectivos programas a disposición de y a ser utilizado por el Secretario de Carreras en sus funciones a satisfacción del Administrador Hípico.

III

En nuestra jurisdicción está firmemente establecido que los tribunales apelativos deben "conceder gran consideración y deferencia a las decisiones administrativas en vista de la vasta experiencia y el conocimiento especializado de la agencia". Por tal razón la revisión judicial de tales decisiones se limita a "determinar si la actuación administrativa fue razonable y cónsona con el propósito legislativo o si, por el contrario, fue irrazonable, ilegal, o si medió abuso de discreción". Torres Acosta v. Junta Examinadora de Ingenieros,

Arquitectos y Agrimensores, res. el 27 de abril de 2004, 161 D.P.R. ___, 2004 TSPR 65, 2004 JTS 71; Ocean View v. Pascual García-Proyecto Reina Del Mar, res. el 31 de marzo de 2004, 161 D.P.R. ___, 2004 TSPR 48, 2004 JTS 59; Oficina de Ética Gubernamental v. Igartúa de la Rosa, res. el 4 de septiembre de 2002, 157 D.P.R. ___, 2002 TSPR 114, 2002 JTS 120; T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 80 (1999).

Además, la Ley de Procedimiento Administrativo Uniforme, 3 L.P.R.A. sec. 2101, dispone que las determinaciones de hechos contenidas en las decisiones de las agencias "serán sostenidas por el tribunal si se basan en evidencia sustancial que obra en el expediente administrativo". 3 L.P.R.A. sec. 2175; Rebollo v. Yiyi Motors, Motor Ambar, Inc., res. el 13 de enero de 2004, 161 D.P.R. ___, 2004 TPSR 2, 2004 JTS 4.

Las agencias administrativas merecen también deferencia en lo que a la interpretación de la legislación que implementan se refiere. Sin embargo, "cuando la interpretación del estatuto que hace la agencia conduce a resultados incompatibles, contrarios al propósito de la ley, ésta no puede prevalecer". T-JAC, Inc. v. Caguas Centrum Limited, supra.

Por otro lado, en García Cabán v. UPR, 120 D.P.R. 167 (1987), se resolvió que "una vez una agencia ha promulgado unos reglamentos para facilitar su proceso decisional y limitar el alcance de su discreción, viene obligada a

observarlos estrictamente". Este razonamiento fue reiterado en Rivera Concepción v. A.R.Pe., res. el 29 de septiembre de 2000, 152 D.P.R. ___, 2000 TSPR 143, 2000 JTS 155; y en Hernández Chiquez v. F.S.E., res. el 22 de diciembre de 2000, 152 D.P.R. ___, 2000 TSPR 191, 2001 JTS 1.

Específicamente en cuanto a la Junta Hípica, el Tribunal Supremo ha expresado que una vez ésta aprueba un Reglamento, el mismo adquiere fuerza de ley, no puede ser variado arbitrariamente y sólo puede ser derogado o modificado mediante la adopción de otra norma posterior. Rosario Mercado v. San Juan Racing Assn., 94 D.P.R. 634 (1967). En tal caso, la Junta Hípica viene obligada a seguir el procedimiento dispuesto en la Ley de Procedimiento Administrativo Uniforme (LPAU), 3 L.P.R.A. secs. 2121 et seq.

IV

Mediante la Ley de la Industria y el Deporte Hípico, supra, nuestra Asamblea Legislativa delegó a la Junta Hípica la importante tarea de autorizar el establecimiento de hipódromos en Puerto Rico. Se trata de una determinación de claro interés público y gran impacto económico. Más aún, evidentemente "se trata de un proceso que requiere la evaluación de muchas circunstancias y factores complejos, y la ponderación de criterios diversos". Lab. Clínico Instituto Central de Medicina Avanzada v. Lab. Borinquen, 149 D.P.R. 121 (1999). No obstante, las determinaciones que

haga la Junta tienen que mantenerse dentro de los límites de lo razonable.

En el caso de autos, la Junta Hípica denegó una solicitud para el establecimiento de un nuevo hipódromo en el país, a pesar de que dicha solicitud fue favorecida por prácticamente todos los numerosos y diversos sectores de la industria hípica, incluyendo a los dueños de caballos, los jinetes, los entrenadores, los criadores de caballos y los agentes hípicos. Fue igualmente favorecida también por los otros organismos gubernamentales que tienen alguna ingerencia en asuntos como éste, incluyendo el Departamento de Desarrollo Económico y Comercio, la Compañía de Turismo y la Compañía de Fomento Industrial. <u>Sólo se opuso la empresa que en ese momento administraba el Hipódromo el Comandante</u>. Tratándose de una contemplada inversión multimillonaria que cuenta con el sólido apoyo de personas, grupos y entidades muy autorizadas, la determinación de la Junta Hípica, que sólo favorece a la compañía que administraba el Hipódromo el Comandante, no estuvo debidamente fundamentada. Veamos.

A. <u>Viabilidad</u>

La Junta fundamentó su denegatoria, en primer lugar, a base de que la peticionaria no había demostrado que fuera económicamente viable la operación simultánea de dos hipódromos en Puerto. Es decir, la Junta estimó que el permiso solicitado no podía concederse si el

establecimiento de un nuevo hipódromo afectaba la viabilidad económica del hipódromo existente, el Comandante. En efecto, la postura referida de la Junta estuvo dirigida a proteger la solvencia económica de la empresa que administraba el Comandante.

Esta postura no es sostenible por varias razones. En primer lugar se trata de una determinación mayormente especulativa y dudosa. La Junta basó su determinación en la opinión de dos peritos económicos de el Comandante quienes sostuvieron el supuesto de que un segundo hipódromo en el sur de Puerto Rico menoscabaría seriamente la solvencia económica de El Comandante. Sin embargo, la parte peticionaria presentó los estudios de dos economistas igualmente capacitados que sostuvieron la tesis de que dos hipódromos operando a la vez eran económicamente viables. La postura de la Junta, además, era contraria a la opinión que tienen casi todos aquellos que podrían verse adversamente afectados, como los dueños de caballos, los jinetes, los agentes hípicos y otros. No puede tomarse una decisión tan importante sobre la base de consideraciones altamente hipotéticas que sólo favorecían a la empresa que en ese momento administraba al Comandante. Este fundamento, pues, no parece tener sustancialmente la objetividad y el mérito necesario para apoyar la determinación en cuestión. La Junta no contó con un estudio económico a fondo, preparado por peritos independientes, que sirvieran de base

para una decisión tan importante, sobre todo en vista de la controversialidad del asunto en cuestión.

En segundo lugar, la referida postura de la Junta Hípica significaría que el Estado está comprometido preferentemente con la supervivencia de una particular entidad comercial privada. Sin embargo, una finalidad tan singular, cuando menos extraña y sorprendente en una sociedad de mercado como la nuestra, no le ha sido encomendada a la Junta Hípica por su ley orgánica. Un análisis cuidadoso de la Ley revela claramente los objetivos que deben informar las labores de la Junta Hípica. Dicha agencia se creó para velar por la seguridad pública, la honestidad y la integridad del deporte hípico. Se procura sobretodo que sea un deporte de calidad, limpia y confiable.[2] En ningún lugar en la Ley se indica o se intima que será función de la Junta proteger la solvencia económica de la empresa que administra a El Comandante. Se trata evidentemente de una función o finalidad tan inusitada y particular que no puede derivarse meramente de los amplios poderes que la ley le concede a la Junta. Para que sea válida, requiere cuando menos que haya sido expresamente concedida por ley. La ley que nos concierne no concede tal finalidad de ningún modo claro.

Nótese asimismo que la propia Ley y hasta el Reglamento mismo de la Junta contemplan expresamente la existencia en el país de más de un hipódromo. En

---

[2] Véase Exposición de Motivos de la Ley.

particular, la Ley le concede a la Junta la facultad de detallar los requisitos que deba satisfacer cualquier hipódromo, y al Administrador Hípico la de suspender las carreras en cualquier hipódromo, todo lo cual implica la posibilidad de que exista más de uno solo. Más aún, la Ley expresamente se refiere a las licencias a concederse "**a los dueños de hipódromos**"; y en más de una ocasión se refiere a los "hipódromos" de Puerto Rico. Se vislumbra claramente, pues, que puedan existir hipódromos en la Isla que compitan entre sí. La cuestión de si tales hipódromos son o no económicamente viables le atañe propiamente a los dueños de éstos, que son quienes mejor conocen qué es lo que le conviene a sus particulares intereses económicos.

Por otro lado, a la Junta sí se le encomendó la tarea de fomentar el crecimiento de la industria hípica. **Parecería que el establecimiento de un hipódromo en el área sur de Puerto Rico, con facilidades superiores a las del hipódromo existente, con el fin de atender una clientela nueva que no acude actualmente al Comandante, y fomentado por un grupo de inversionistas que están dispuestos a exponer su dinero para ese fin, es precisamente un paso concreto hacia el crecimiento de dicha industria.**

La Junta Hípica, pues, erró al denegar la licencia solicitada por el fundamento en cuestión.

B. <u>Financiamiento</u>

La Junta también decidió que debía denegar la licencia solicitada porque la parte proponente no había presentado una carta-compromiso firme de financiamiento. Esta determinación tampoco es válida. Al examinar la orden sobre el particular de la Junta emitida el 16 de agosto de 2000, notamos que entonces sólo se le requirió a la parte proponente "el nombre y la dirección exacta de cualquier entidad financiera con quien la peticionaria haya acordado obtener el financiamiento necesario". La parte proponente cumplió con este requisito. Según se desprende del expediente, la empresa Doral Securities manifestó su "intención de seguir trabajando con Parque Ecuestre La Esmeralda, Inc. con el objetivo de producir eventualmente dicho financiamiento". Según la carta sobre este asunto presentada en evidencia, Doral Securities no podía ofrecer un compromiso más firme que el anterior hasta tanto Parque Ecuestre obtuviese la licencia de hipódromo.

Según la evidencia que obra en el expediente, el costo aproximado de la obra contemplada es de cuarenta y cinco millones de dólares. Alrededor de una tercera parte de los fondos serían aportados por los accionistas actuales de Parque Ecuestre y de una emisión privada de la corporación. El resto sería financiado mediante una emisión de bonos de la Autoridad para el Financiamiento de Facilidades Industriales y de Control Ambiental (en adelante AFICA) y otro financiamiento por instituciones privadas. La parte

peticionaria evidenció haber iniciado gestiones para obtener financiamiento a través de una emisión de bonos de AFICA, pero para obtener finalmente la emisión, según los propios funcionarios gubernamentales, era necesario que la empresa obtuviese la licencia para operar el hipódromo. La decisión de la Junta de exigir posteriormente que hubiese un compromiso firme de financiamiento es evidentemente irrazonable puesto que colocaba a los proponentes en una disyuntiva contradictoria: la de obtener los fondos para financiar el proyecto antes de recibir la licencia de operación cuando la tenencia de tal licencia era esencial para lograr el financiamiento mediante bonos.

C. División de días de carreras

La Junta determinó que la construcción de un nuevo hipódromo implicaría dividir los días de carreras, lo cual supuestamente no traería beneficio alguno a la industria hípica, y apoyó en esto también su denegatoria de la licencia solicitada. Resulta, sin embargo, que esta determinación no tiene base alguna en el expediente. Aún asumiendo que hubiese que dividir los días de carreras, no es razonable suponer la ausencia de beneficios para la industria hípica. Según la prueba presentada, la celebración de carreras de caballos en un hipódromo establecido en el área sur de la Isla, donde las alternativas de entretenimiento son más limitadas que en el área metropolitana, atraería a este hipódromo gran cantidad

de público que no asiste actualmente al Comandante. Ello, sin duda, sería de gran beneficio para la industria hípica puertorriqueña. Además, las facilidades propuestas por Parque Ecuestre, tales como la pista de grama, permitirían la celebración de carreras donde podrían participar un sinnúmero de ejemplares que en la actualidad no están cualificados para correr en la pista del Comandante, lo que también sería de beneficio para la industria. Más aún, se desprende del expediente que la distribución de los días de carreras entre dos hipódromos sería beneficioso para los equinos puesto que permitiría un mejor mantenimiento de las pistas de cada cual.

D. Estudio de Impacto

Otro de los fundamentos en que se apoyó la Junta para denegar la licencia solicitada fue que la parte peticionaria no había ofrecido un estudio serio que analizara a fondo el impacto sobre los empleados y demás personas que dependen del Comandante si los días de carreras de este hipódromo se redujeran a la mitad. Esta determinación de la Junta es defectuosa. La Junta hizo esta determinación a pesar de que el estudio referido no se le solicitó a la parte peticionaria como parte del procedimiento para obtener la licencia. Se trata de una exigencia formulada al momento de denegar la licencia y no antes. Asumiendo que la información en cuestión sea necesaria para que la Junta pueda decidir responsablemente,

lo que procedía era que la Junta requiriese el estudio en cuestión y le diese a los proponentes una oportunidad razonable de realizarlo, antes de usar su ausencia como una excusa sobre la cual apoyar su denegatoria. Erró la Junta al actuar como lo hizo sobre este particular.

E. Sistema electrónico de apuestas

La Junta determinó además que la parte peticionaria no poseía un plan para el sistema electrónico de apuestas. Esta determinación contradice la prueba que obra en el expediente. La peticionaria presentó el testimonio de Don Drew, pasado asesor de la corporación operadora del Comandante y quien participó en el proceso de instalación del sistema electrónico de apuestas que opera actualmente en el Comandante. Este testigo estableció tener la capacidad para gestionar para los proponentes del nuevo hipódromo la instalación exitosa del sistema electrónico de apuestas, capacidad que no fue controvertida. Además, este perito testificó, sin ser controvertido, que Parque Ecuestre no podía otorgar un contrato para la elaboración de un sistema electrónico de apuestas con la compañía que lo suministra hasta tanto no obtuviese una licencia de hipódromo. De nuevo, la Junta formula una "razón" para denegar la licencia que debió ser más bien una condición al concederla. También debe señalarse que aunque este asunto fue discutido en las vistas públicas celebradas por la Junta sobre la petición de la licencia, ésta no incluyó lo

del sistema electrónico en cuestión como requisito en su orden de 16 de agosto de 2000.

F. Ejemplares de carreras

Otro de los criterios en que la Junta basó su determinación fue el "problema actual de falta de ejemplares de carreras y nuevos dueños de caballos", y la ausencia de un plan por parte de Parque Ecuestre para manejarlo. Esta determinación es a todas luces irrazonable. En primer lugar, de concederse una licencia de hipódromo, la construcción del mismo tomaría al menos dos años, tiempo suficiente para la cría de nuevos ejemplares, según la evidencia incontrovertida que obra en el expediente. En segundo lugar, se desprende del expediente que la peticionaria presentó un plan para fomentar el aumento de ejemplares de carreras, el cual incluye pistas de grama para celebrar carreras de ejemplares que no pueden participar en carreras en pistas de tierra.

La Junta también concluyó que de surgir la necesidad de transportar los ejemplares de carreras entre uno y otro hipódromo, los dueños de caballos no analizaron el factor riesgo y los costos que ello conlleva. Aquí, de nuevo, faltó la Junta. Primeramente, al presente, la necesidad de transportar ejemplares entre un hipódromo y otro es especulativa. Lo natural, según la evidencia que obra en el expediente, es que el número de ejemplares de carreras aumente entre la fecha de concesión de la licencia para

operar el nuevo hipódromo y el comienzo de sus operaciones. En caso de que fuera necesaria la transportación de ejemplares, la proponente se comprometió a asumir los costos que conlleve. Esta evidencia no fue controvertida. Por otro lado, según el testimonio del perito de la peticionaria, Don Drew, la transportación de ejemplares entre distintos hipódromos es una práctica generalizada en los Estados Unidos, y en Puerto Rico no representaría mayores problemas para los equinos. Esta evidencia tampoco fue efectivamente controvertida. En adición, la resolución de la Junta no apunta a evidencia sustancial que obre en el expediente que demuestre que los dueños de ejemplares no hubiesen considerado los riesgos de transportar sus ejemplares.

V

En resumen, pues, es evidente que las determinaciones hechas por la Junta Hípica para fundamentar su decisión de denegar la licencia solicitada no son adecuadas. Carecen de la objetividad y el mérito que son necesarios para que se estime que son razonables. Delatan una parcialidad indebida de parte de la Junta hacia proteger a la empresa que en ese momento administraba a El Comandante. No reflejan un intento auténtico por evaluar de manera ecuánime la importante propuesta de la parte peticionaria. No le compete a una agencia administrativa como la Junta la finalidad de procurar la solvencia económica de una de las

empresas que regula y fiscaliza, a menos que ello le haya sido clara y expresamente encomendado por ley. Por ello, debe concluirse que la Junta Hípica abusó de su discreción al denegar la petición de licencia a Parque Ecuestre La Esmeralda, Inc., sobre todo utilizando criterios irrazonables que no surgen de la Ley de la Industria y el Deporte Hípico ni aún de su propio Reglamento.

Por los fundamentos expuestos procede que se revoque la resolución emitida por el Tribunal de Apelaciones el 16 de septiembre de 2003 y la resolución de la Junta Hípica del 27 de mayo de 2003, y que se ordene la devolución del caso a la Junta Hípica para que evalúe nuevamente la petición.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO